781 A.2d 1041 (2001)
344 N.J. Super. 225
COUNCIL OF ALTERNATIVE POLITICAL PARTIES ("CAPP"), Reform Party of New Jersey, New Jersey Libertarian Party, Inc., George Guzdek, and John Paff, Plaintiffs-Respondents,
v.
STATE of New Jersey, DIVISION OF ELECTIONS and John J. Farmer, Jr., in his capacity as Attorney General of New Jersey, and his successor, Defendants-Appellants, New Jersey Republican State Committee and New Jersey Democratic State Committee, Intervenors-Appellants.
Nos. A-5698-99T5, A-5701-99T5.[1]
Superior Court of New Jersey, Appellate Division.
Argued December 4, 2000.
Decided September 10, 2001.
*1042 Donna Kelly, Senior Deputy Attorney General, argued the cause for appellants *1043 State of New Jersey, Division of Elections and John J. Farmer, Jr. (John J. Farmer, Jr., Attorney General, attorney; Mark J. Fleming, Assistant Attorney General, of counsel; Ms. Kelly and Pamela E. Schneider, Deputy Attorney General, on the brief).
Peter G. Sheridan, Morristown and Eileen Fahey, Medford, argued the cause for intervenors-appellants (Graham, Curtin & Sheridan, Morristown, for intervenor-appellant New Jersey Republican State Committee and John E. Harrington, Medford, for intervenor-appellant New Jersey Democratic State Committee; Mr. Sheridan and Mr. Harrington, of counsel; Dorothy A. Harbeck and Christopher J. Keale, Morristown, on the joint brief).
Frank Askin, Newark and Renee Steinhagen, argued the cause for respondents (Mr. Askin and Ms. Steinhagen, on the brief).
Before Judges WEFING, CUFF and LEFELT.
The opinion of the court was delivered by CUFF, J.A.D.
In this appeal, we consider whether two statutes which preclude a registered voter from declaring a party affiliation other than Republican, Democrat or Independent deny voters and political organizations other than the two established major parties equal protection of the laws and infringe on their rights of free speech and association. Judge Parrillo held that each plaintiff organization was entitled to be considered a political party for the limited purposes of the party declaration forms maintained by the commissioners of registration and inclusion on the state-compiled voter registration lists. We affirm.
Plaintiffs filed a complaint on January 20, 1999, against defendants State of New Jersey and the Attorney General seeking declaratory and injunctive relief. Specifically, plaintiffs sought to declare the statutory definition of "political party," N.J.S.A. 19:1-1, unconstitutional. They also sought a declaration that N.J.S.A. 19:23-45, which prohibits a voter from declaring a party affiliation other than Democrat or Republican, and N.J.S.A. 19:31-18.1, which requires the county clerks to provide five free copies of the registry lists to Staterecognized political parties, are unconstitutional. As a whole, the complaint challenges the primary election process, candidate ballot placement, the composition of the election board and poll watchers, fundraising, and other regulatory matters as it affects what are commonly referred to as minor or alternative political parties. This appeal, however, focuses on the single and narrow issue of whether the inability of a registered voter to declare an affiliation with an alternative political party infringes plaintiffs' First Amendment rights of expression and association and equal protection.
The issue was presented to the trial court on a comprehensive stipulation of facts. The stipulation is appended to this opinion as an Appendix. This opinion only summarizes the twenty page stipulation.
Plaintiff Council of Alternative Political Parties (CAPP) was established in January 1997. It advocates a more open and responsive political system in New Jersey. Its membership includes the Green Party of New Jersey, the Natural Law Party, the Libertarian Party, the Reform Party, and the U.S. Taxpayers Party of New Jersey.
Plaintiff Reform Party of New Jersey is best known through H. Ross Perot's campaign for the Presidency in 1992 and 1996. Perot received 15.6 percent of the popular vote in New Jersey in 1992 and 8.52 percent of the popular vote in New Jersey in 1996.
*1044 The Reform Party focuses on campaign finance and election reform in order to open the political system to new voices, and on fiscal reform issues directed at ending deficit spending. In 2000, the Reform Party presented Pat Buchanan as its candidate for President, Pat DiNizio as its candidate for U.S. Senator, and several candidates for the House of Representatives. The Reform Party of New Jersey has never presented a candidate for Governor or State Senate.
The Reform Party had two Assembly candidates in 1997 who received 0.04 percent of the total votes cast. In 1998, the Reform Party ran two congressional candidates in New Jersey. These candidates earned 0.09 percent of the votes. In the 1999 general election, the Reform Party had one Assembly candidate and two other candidates using similar designations.
The Reform Party presently has approximately 275 enrolled members in New Jersey. These dues-paying members hold elections for officers and organize a steering committee at an annual convention. To promote the party, the Reform Party has a web site, a newsletter, bulk mailings, door-to-door recruitment, and invitational meetings. Plaintiff George Guzdek is a member of the Reform Party.
Plaintiff New Jersey Libertarian Party, organized in 1973, is an affiliate of the National Libertarian Party. It seeks to promote the rights of individuals to exercise control over their lives so long as they do not forcibly interfere with the equal rights of others to live as they choose. The party also promotes free enterprise, free trade and limited involvement in foreign affairs. Plaintiff John Paff is a member of the Libertarian Party.
The Libertarian Party has run a candidate for President in each election since 1972. In 1996, for example, the Libertarian candidate Harry Browne, received 14,763 votes or 0.51 percent of the popular vote in New Jersey. In 1992, the Libertarian candidate received 0.20 percent of the popular vote in New Jersey.
The Libertarian Party's candidates for United States Senate have had similar results ranging from 0.2 percent to 0.72 percent for the 1976 to 1994 period. There was no candidate for U.S. Senate in 1996. In 1998, the New Jersey Libertarian Party ran nine congressional candidates and several local candidates in New Jersey. In 2000, the Libertarian party had a candidate for President, Harry Browne; a candidate for U.S. Senate, Emerson Ellett; and candidates for the House.
In the 1997 gubernatorial election in New Jersey, the New Jersey Libertarian Party candidate, Murray Sabrin, received 114,172 votes or 4.7 percent of the popular vote. It did not have a candidate in 1993 and between 1973 and 1989 its gubernatorial candidates received between 0.10 and 0.53 percent of the popular vote. In New Jersey General Assembly elections, Libertarian candidates from 1975 to 1997 received between 0.01 and 0.22 percent of the popular vote. The New Jersey Libertarian Party elects officers and trustees at its annual convention, along with the chairpersons of local county chapters (in about a dozen counties). To promote the party, the New Jersey Libertarian party has a web site, member newsletter, invitational meetings, and has set up "politically homeless booths" at fairs and other events.
By order dated September 10, 1999, Judge Parrillo allowed the New Jersey Republican State Committee (RSC) and the New Jersey Democratic State Committee (DSC) the right to intervene. Both Committees have joined the State as appellants.

I
A brief review of Title 19 as it pertains to the narrow issue presented by this appeal *1045 is in order. N.J.S.A. 19:1-1 defines "political party" as
a party which, at the election held for all of the members of the General Assembly next preceding the holding of any primary election held pursuant to this Title, polled for members of the General Assembly at least 10% of the total vote cast in this State.
By earning the status of a recognized "political party," the party may participate in primary elections. In order to select a candidate to run in the general election against candidates from other parties for any particular office, a political party may nominate candidates at a primary election. N.J.S.A. 19:5-1.
Voters are allowed to affiliate with any of the recognized political parties and to vote in the primaries. N.J.S.A. 19:23-45. Registered voters simply fill out a political party declaration form with their county commissioner of registration fifty days before the primary. Ibid. Upon signing and filing a declaration to vote in the primary election of a political party, a voter is considered a member of that party. Ibid.
The county commissioners maintain a list of these declarations, and anyone may obtain this list for a nominal payment. N.J.S.A. 19:31-18, -18.1. Recognized political parties, however, receive this list free of charge. N.J.S.A. 19:31-18.1(a). Until a political organization reaches the status of a political party, the county commissioners of registration are not required to record and maintain any declaration other than Democrat, Republican, Independent or Unaffiliated.

II
It is undisputed that the voter registration lists, with voter affiliation information, inform the State and recognized political parties of the identity of eligible voters. These lists assist the State to conduct fair and honest primary elections. It is also undisputed that these lists provide essential information to the RSC and DSC for other campaign and party-building activities, including canvassing and fundraising.
Plaintiffs argue that both the inability of their members to declare their party affiliation and for them to obtain affiliation lists of their members from election officials treat them differently than other political organizations and imposes a severe burden on their opportunities to express their political beliefs, identify others with similar beliefs, and associate and organize with others with similar beliefs. The differential treatment and the burdens which ensue create a substantial barrier to the political system and impede their ability to achieve the 10 percent threshold.
Presently, all voters in New Jersey are grouped into one of four categories: Democrat, Republican, Independent, and Undeclared/Unaffiliated/Open. The latter group is the largest group of voters in New Jersey. A voter must expressly indicate an affiliation as a Democrat, Republican or Independent. If no declaration is made, the voter is classified as Unaffiliated. As of June 2, 1998, 19.18 percent of the registered voters in New Jersey were declared Republicans, 25.38 percent were declared Democrats, .24 percent were declared Independents, and 55.20 percent were classified Unaffiliated.
Judge Parrillo held that all of plaintiff organizations were entitled to be designated as "political parties" under equal protection principles for purposes of inclusion on party declaration forms and access to state-compiled voter registration lists. He found that these groups were "substantially similar" to the Democratic and Republican parties of New Jersey. The trial court held "plaintiffs have demonstrated that they are meaningful institutions capable of organizing political discourse and advancing issues and interests that give politics *1046 weight," notwithstanding the failure of any of the plaintiff organizations to meet the legislative mandate of 10 percent of the vote in the last election of the General Assembly of New Jersey.
Judge Parrillo further found that the statutory disparity impacts plaintiffs' fundamental right of political association by "(1) depriving them of an equal opportunity to identify their followers; (2) reducing their ability to compete with the recognized political parties; and (3) exacerbating the financial disparity between plaintiffs and recognized political parties." The trial judge identified four reasons why the burden was severe. First, he noted that the victim of the discrimination was a political organization. Second, the disparity impairs the First and Fourteenth Amendment rights of the organization. Third, he recognized that there was no likelihood of a legislative remedy. Fourth, by using the biennial General Assembly election as the standard, alternative parties are effectively frozen out of the process. In order to have any realistic opportunity to garner the requisite 10 percent, an alternative party must run a candidate in most, if not all, of the forty Assembly districts.
Finally, Judge Parrillo recognized the State's interests in holding "fair, honest and efficient primaries," "avoiding frivolous, insubstantial attempts to register party affiliation," and "avoiding undue expense" as legitimate State interests. Yet, he ultimately concluded that the interests were not "sufficiently weighty" to justify the differential treatment.
Judge Parrillo also conducted an alternative analysis based on the assumption that the burdens imposed on plaintiffs' First and Fourteenth Amendment rights were moderate rather than severe. He reached the same result. Accordingly, he declared this State's affiliation scheme, N.J.S.A. 19:23-45 and 19:31-18.1, unconstitutional because it denies to plaintiffs equal protection of the law by unnecessarily burdening their First and Fourteenth Amendment right to political association. The order effectuating this ruling has been stayed pending appeal.

III
Minor or alternative party challenges to state regulation of major and minor political organizations fall into three general categories: 1) party nomination procedures, 2) registration and qualification of voters, including party affiliation, and 3) the voting process. Although plaintiffs' complaint implicates each category, this appeal is confined to the second category: party affiliation and registration procedures.[2]
In Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court declared that an Ohio statute requiring an independent candidate for President to file a statement of candidacy eight months before the general election in November unconstitutionally burdened the voting and associational rights of voters, including the candidate's supporters. The Court recognized that each state has important regulatory interests concerning the election process, notably to assure honesty and fairness throughout the process. The regulation, however, must be reasonable and nondiscriminatory. Id. at 788, 103 S.Ct. at 1570, 75 L.Ed.2d at 557.
*1047 The Court further observed that each challenge must be resolved on a case-by-case basis, utilizing an established analytical process. Id. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. Justice Stevens described that process as follows:
[A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

[Ibid.]
In Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), in the course of upholding Hawaii's ban on write-in candidates, the Court expanded on the Anderson test. It stated that
[when minor party] rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance. "But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" ... "the State's important regulatory interests are generally sufficient to justify" the restrictions.
[Id. at 433, 112 S.Ct. at 2063-64, 119 L.Ed.2d at 253-54 (citations omitted).]
It is this test which has been utilized since 1983 to adjudicate minor party challenges to a state election scheme.[3]
Notably, the Court recognized that the impact on voters of candidate eligibility requirements implicates basic constitutional rights, namely freedom of association for the exchange and advancement of ideas which, of course, embraces freedom of speech. Anderson, supra, 460 U.S. at 786-87, 103 S.Ct. at 1569, 75 L.Ed.2d at 556. Further, after Burdick, the level of scrutiny applied to a challenged restriction quite clearly depends on the nature of the interest impinged on or burdened by the restriction and the extent of the burden. A state restriction which creates access barriers to the ballot thereby restricting the candidate field does not compel close scrutiny; however, when these state restrictions severely burden First and Fourteenth Amendment rights, close scrutiny is in order. Burdick, supra, 504 U.S. at 434, 112 S.Ct. at 2063, 119 L.Ed.2d at 253-54.
It is undisputed that the First Amendment and Fourteenth Amendment protect the rights of citizens to associate and form political parties. Timmons v. Twin Cities Area New Party,' 520 U.S. 351, 357, 117 S.Ct. 1364, 1369, 137 L.Ed.2d 589, 597 (1997). In fact, the independent expression of a political party or organization's views is a "core" First Amendment activity. Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 616, 116 S.Ct. 2309, 2316, 135 *1048 L.Ed.2d 795, 805 (1996). This includes the right to create and advance new parties which enhances the constitutional interests of like-minded voters to gather to pursue common ends. Norman v. Reed, 502 U.S. 279, 288, 112 S.Ct. 698, 705, 116 L.Ed.2d 711, 722-23 (1992).
The right of an alternative party to organize and disseminate its message cannot be minimized. Although some view alternative parties as synonymous with party splintering and excessive factionalism which lead to political destabilization, see Timmons, supra, 520 U.S. at 367, 117 S.Ct. at 1374, 137L.Ed.2d at 603, others disagree. Indeed, some students of minor or alternative parties consider such parties an integral part of the political process. These same writers heartily dispute the notion that the role or influence of a minor party can be measured solely by the numbers of votes cast. Some view minor or alternative parties or movements as significant contributors to modern party development by forcing clarification of party platforms and the inevitable realignment of membership. See V. Key, Politics, Parties, and Pressure Groups at 280-309 (5th ed.1958).
Nevertheless, the state has a role in enacting reasonable regulations of parties, elections and ballots to reduce election and campaign disorder and to advance fair and honest elections. Timmons, supra, 520 U.S. at 358, 117 S.Ct. at 1369, 137 L.Ed.2d at 598; Burdick, supra, 504 U.S. at 433, 112 S.Ct. at 2063, 119 L.Ed.2d at 252-53. In the name of order, harmony and honesty, however, a state may not impose severe burdens on those rights in the absence of a weightier state interest. Timmons, supra, 520 U.S. at 358, 117 S.Ct. at 1370, 137 L.Ed.2d at 598.
In Timmons, for example, the Court upheld a state anti-fusion statute. This statute precluded any party from designating a declared candidate for another party as its candidate. The Court acknowledged that the ban imposed a restriction on the other parties due to their inability to express their support for the candidate on the ballot. The burden, however, was characterized as minimal. Id. at 364, 117 S.Ct. at 1372-73, 137 L.Ed.2d at 601. The restrictions were justified by weighty, valid state interests in ballot integrity and political scrutiny. Id. at 367, 117 S.Ct. at 1374, 137 L.Ed.2d at 605. Notably, the ban applied to all parties, major and minor alike. Id. at 360, 117 S.Ct. at 1370, 137 L.Ed.2d at 599. Moreover, the Court noted that the affected parties still could endorse the other party's candidate and urge their members to vote for the candidate. Id. at 360, 117 S.Ct. at 1371, 137 L.Ed.2d at 599.
Preliminary to an application of the Anderson analysis, we must first determine whether the plaintiffs are similarly situated to the statutory political parties and whether they are subject to disparate treatment. The latter question is readily answered in the affirmative. Relevant to the voter declaration affiliation and access to affiliation lists issues in this appeal, the DSC and the RSC are treated differently from plaintiff organizations. Voters are allowed to announce their preference, that preference is recorded and maintained by county and state officials, and is produced without cost to these parties. N.J.S.A. 19:31-18.1a.[4] The different treatment bestows a substantial benefit on the RSC and DSC. In effect, it amounts to a state subsidy of their party-building efforts. *1049 We also conclude that for purposes of the voter affiliation declaration and access to the affiliation lists, the parties are similarly situated. The statutory political parties have the same interest as plaintiff organizations in identifying those who declare an affinity for the platform or the candidates presented by the party. They have the same interests in building their party through the attraction of other voters and the identification of those who may make contributions to the party beyond a vote.
We must also identify the interests affected by the disparate statutory treatment. Here, by precluding a voter from stating a party affiliation other than Democrat or Republican, a voter is prevented from publicly expressing a party preference even in the preliminary stages of the electoral process. The same restriction hinders not only the voter but also the organization from associating with others with similar views on public issues. In effect, the state-administered scheme marginalizes voters and political organizations who depart from or disagree with the status quo. These restrictions, therefore, transgress not only voters but also plaintiff organizations' First Amendment rights of free speech and association.
The Anderson analysis also requires this court to characterize the burden imposed on plaintiffs' First Amendment rights. Anderson, supra, 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. If the burden is severe, the restrictions will be subjected to close scrutiny and the State's interests justifying the burden must be compelling. Timmons, supra, 520 U.S. at 358, 117 S.Ct. at 1370, 137 L.Ed.2d at 598; Burdick, supra, 504 U.S. at 433, 112 S.Ct. at 2063, 119 L.Ed.2d at 253. When the restrictions are severe, they must be narrowly tailored to satisfy a compelling state interest. Timmons, supra. On the other hand, if the burden is considered minimal, the state's valid regulatory interests are generally considered sufficient to justify the burden. See Burdick, supra, 504 U.S. at 434, 112 S.Ct. at 2064, 119 L.Ed.2d at 253-54 (write-in vote ban imposed a limited burden and furthered reasonable, nondiscriminatory state interests). See also Timmons, supra, 520 U.S. at 362-63, 117 S.Ct. at 1372, 137 L.Ed.2d at 601 (anti-fusion ban applicable to all parties imposes only a minor burden on First Amendment rights; constitutional challenge rejected).
Several recent cases concerning restrictions imposed on alternative parties inform our analysis of the nature of the burdens imposed and interests advanced by the restrictions. The case most directly on point is Baer v. Meyer, 728 F.2d 471 (10th Cir.1984). In Baer, the Court of Appeals held that a Colorado statute which allowed voter registrants to indicate their affiliation only with parties recognized as a "political party" was unconstitutional. Id. at 475. Significantly, the court recognized that "access to minimal information about political party affiliation is the key to successful political organization and campaigning." Ibid. It also characterized as nominal the administrative burden to record the minor party affiliation. Ibid.
The State and the intervenors argue that Judge Parrillo's and plaintiffs' reliance on Baer is misplaced due to a different result by the same court in a 1988 challenge to ballot access and voter registration laws in Oklahoma. In Rainbow Coalition of Okla. v. Oklahoma State Election Bd., 844 F.2d 740 (10th Cir.1988), the court rejected a challenge to an Oklahoma statute which granted political party status to an organization which received 5 percent of the vote cast in the last general election for governor or president. The Court recognized that the disparate treatment implicated the First Amendment *1050 rights of the non-qualifying political organizations. Id. at 747. The court also recognized that a "state has a substantial interest in preventing `the purely frivolous and insubstantial attempts to designate party affiliation on the registration form.'" Ibid. (quoting Baer, supra, 728 F.2d at 475). Ultimately, the court found that the state's interest prevailed, emphasizing that the Oklahoma voter registration lists were not computerized. Ibid.
The State and intervenors also argue that Iowa Socialist Party v. Nelson, 909 F.2d 1175 (8th Cir.1990) undercuts the Baer ruling. Notably, however, the statute governing the voter affiliation declaration process recognized political organizations which gained 2 percent of the total vote cast for president or governor in the most recent general election. This is a significantly lower numerical threshold than the threshold established by N.J.S.A. 19:1-1. Furthermore, the statutory reference of the votes cast for president or governor establishes a lower threshold. As this case demonstrates, the Reform Party would have qualified as a political party under the Iowa scheme following the 1992 Presidential election in which it polled 15.6 percent of the popular vote in New Jersey.
Another court invalidated a statute which authorized the voter registration board to make copies of the registration list available to Democrats and Republicans but to only make the list available for inspection to all others. Libertarian Party of Ind. v. Marion County Bd. of Voter Registration, 778 F.Supp. 1458 (S.D.Ind.1991). The court found that the statute impinged on both the members' freedom to associate to express their views to voters and on the voters' ability to express their political preference. Id. at 1463. The court noted that the manner of access afforded alternative parties required a tremendous expenditure of time and labor. Ibid. The court also found that the state offered neither a compelling interest nor a justifiable purpose for effectively granting the recognized major parties a significant subsidy. Ibid. Cf. Rosen v. Brown, 970 F.2d 169 (6th Cir.1992) (statute prohibiting ballot designation "Independent" for Independent candidates while allowing "Republican" or "Democrat" designation found unconstitutional after subjected to intermediate level of scrutiny).
We also pause to consider Reform Party of Allegheny County v. Allegheny County Dep't of Elections, 174 F.3d 305 (3d Cir.1999). This case involves a Pennsylvania statute which precluded cross-endorsements by minor parties but which allowed the same practice by major parties. The court originally ruled that this scheme violated the minor parties' equal protection rights. Patriot Party of Allegheny County v. Allegheny County Dep't of Elections, 95 F.3d 253 (3d Cir.1996). The court reexamined its ruling in light of Timmons, supra, and concluded that Timmons did not undermine its equal protection analysis in Patriot Party. Reform Party, supra, 174 F.3d at 307. The court was able to distinguish Timmons because the anti-fusion statute at issue there applied to all parties while the cross-endorsement ban before it affected only minor parties. Id. at 312-13.
The court also re-examined the impact of the cross-endorsement ban on the rights at stake. In doing so it identified several burdens which had the effect of "`help[ing] to entrench the decided organizational advantage that the major parties hold over new parties struggling for existence.'" Reform Party, supra, 174 F. 3d at 314 (quoting Patriot Party, supra, 95 F.3d at 269). The court then determined that it must use an intermediate level of scrutiny. Reform Party, supra. Judge Roth explained the choice as follows: *1051 The Court in Timmons addressed similar burdens (in its associational rights analysis) in the context of a general ban on fusion and concluded that the burdens, although not trivial, were not severe. Timmons, [supra, 520 U.S. at 358-61,] 117 S.Ct. at 1370-72[, 137 L.Ed.2d at 598-601]. The Court then proceeded to apply not strict scrutiny, but an intermediate level of scrutiny, in which "the State's asserted regulatory interests need only be `sufficiently weighty to justify the limitation' imposed on the [minor party's] rights." Id. at 1372 (citing Norman, 502 U.S. at 288-89, 112 S.Ct. 698 [at 705, 116 L.Ed.2d at 723]). Under this standard, the Court indicated that it would not "require elaborate, empirical verifications of the weightiness of the State's asserted justifications." Timmons, supra, [520] U.S. at [363], 117 S.Ct. at 1372, 137 L.Ed.2d at 598] (citing Munro v. Socialist Workers Party, 479 U.S. 189, 195-96, 107 S.Ct. 533, [538,] 93 L.Ed.2d 499[, 506] (1986)).
If we assume, and we believe we must, that the above stated burdens require the same level of scrutiny in an equal protection analysis that they do in an associational rights analysis, then we must now apply an intermediate level of scrutiny. In doing so, we will recognize, however, that because of the discriminatory aspects of the Pennsylvania statutes, the burdens imposed by them on voters and on political parties are more onerous than those involved in Timmons.
[Reform Party, supra, 174 F.3d at 314-15.]

IV
We conclude that the voter affiliation declaration scheme and the procedure for maintaining and disseminating this informationimposes a considerable, albeit not severe, burden on plaintiffs' First Amendment rights to express political ideas and to associate to exchange these ideas to further their political goals. The impact is attested to by the value placed on this information by leaders of the DSC and RSC. Mr. Giblin and Mr. Haytaian, State Chairpersons of their respective parties, admitted that the ability to identify voters sympathetic to their cause is significant and the lists obtained of registered and declared voters are a primary base for canvassing, fund-raising and other partybuilding activities.
As applied to minor or alternative parties, however, the statutory scheme imposes a significant handicap on the alternative parties' ability to organize while reinforcing the position of the established statutory parties. The State is not free, particularly at State expense, to enhance or to subsidize the party-building activities of the statutorily recognized parties by stifling political discussion and association of alternative political parties.
The State suggests that the scheme simply denies the alternative parties a benefit. It also suggests that any burden is minimized by the availability of the voter registration lists at a nominal cost. As to the latter argument, the simple answer is that the voter registration lists provide little, if any, useful information to plaintiffs because their followers are unable to declare their party affiliation. Furthermore, the Supreme Court has recently reminded us that even nominal fees may amount to an impermissible condition on the exercise of First Amendment rights. See Green Party of New Jersey v. Hartz Mountain Indus., Inc., 164 N.J. 127, 157, 752 A.2d 315 (2000).
As to the benefit argument, we, like Judge Parrillo, are not persuaded that plaintiffs' arguments can be dismissed so easily. Having decided not only to maintain the information but also to disseminate *1052 the information, the State has joined in the efforts by the established parties to maintain the status quo. Interestingly, while recognizing that a state has a valid interest in maintaining a list of qualified and registered voters to assure the fair, honest and efficient administration of the primary and general election process, the Supreme Court of the United States reminded us that the state does not have an unconditional license to insure the preservation of the present political order. Chief Justice Rehnquist wrote:
This interest does not permit a State to completely insulate the two-party system from minor parties' or independent candidates' competition and influence, nor is it a paternalistic license for States to protect political parties from the consequences of their own internal disagreements.
[Timmons, supra, 520 U.S. at 366, 117 S.Ct. at 1374, 137 L.Ed.2d at 603 (citations omitted).]
Having identified the burdens imposed on plaintiffs' rights of free expression and association and having characterized the severity of the burdens imposed by the challenged scheme, we must consider the interests advanced by the State in justification for the burdens. The State identifies three interests: maintenance of ballot integrity, avoidance of voter confusion, and ensuring electoral fairness. These interests have been recognized as valid interests in cases involving questions of ballot access. See Munro, supra, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499; American Party of Tex. v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). We fail to see, however, how any or all of these interests justify the burdens imposed on plaintiffs. Indeed, in the context of voter declaration of affiliation and maintenance of lists of registered voters by affiliation, these interests are irrelevant.
Furthermore, the administrative burden to allow plaintiffs' organizations to be listed on voter registration records is minimal. The parties stipulated that the State's twenty-one county commissioners of registration have computerized voter registration systems. The systems maintain four categories of affiliation or nonaffiliation: Democrat, Republican, Independent and Unaffiliated. To be sure, the ability of a county commissioner of registration to electronically increase the number of political party designations varies throughout the State; however, sixteen of the twenty-one counties could accommodate plaintiffs' organizations without any modifications and the five remaining counties could do so at minimal cost. The cost estimate to reprint 300,000 voter registration cards is $3000. Moreover, the County and State's ability to maintain the voter declaration records of the .24 percent of voters who declare as Independents belies the State's contention of administrative burden.
Thus, when we balance the nature of the burdens imposed on plaintiffs, the severity of the burdens, and the State's justification of these burdens, we are persuaded that the failure of the Legislature to recognize that alternative parties are entitled to the same opportunity to have their followers declare their affiliation and to have the county registrars maintain and disseminate this information to alternative parties on the same terms as the DSC and RSC constitutes an impermissible burden on their First Amendment rights and denies to plaintiffs the equal protection of the laws.
As in Baer, this does not require the county registrars to record and the State to maintain a party affiliation list for any group. This ruling is limited only to plaintiff organizations. Each group has a defined organization with officers, a steering *1053 committee and dues-paying members. Each has adopted procedures for nominating members as candidates for particular offices. Plaintiff organizations should not be confused with the candidate who gains access to the ballot through this State's liberal ballot access laws and who formulates a three word slogan allowed by statute. Accordingly, Judge Parrillo's April 25, 2000 order is affirmed.
Affirmed.
APPENDIX

IN THE SUPERIOR COURT OF NEW JERSEY,

CHANCERY DIVISION
Frank Askin, Esq.
CONSTITUTIONAL LITIGATION CLINIC
Rutgers University School of Law
15 Washington Street Newark, New Jersey 07102
(973) 353-5687
-and-
Renee Steinhagen, Esq.
PUBLIC INTEREST LAW CENTER OF
NEW JERSEY, INC.,
An Appleseed Foundation Affiliate
833 McCarter Highway
Newark, New Jersey, 07102
(973) 6428719
Attorneys for Plaintiffs

SUPERIOR COURT OF NEW JERSEY

CHANCERY DIVISIONMERCER COUNTY

Docket No. MER-C-000006-99
COUNCIL OF ALTERNATIVE
POLITICAL PARTIES ("CAPP"),
REFORM PARTY OF NEW JERSEY,
NEW JERSEY LIBERTARIAN PARTY
INC., GEORGE GUZOEK, AND JOHN
PAFF,
Plaintiffs,
APPENDIX-Continued
v.
STATE OF NEW JERSEY, DIVISION
OF ELECTIONS and PETER
VERNIERO, in his capacity as
Attorney General of New
Jersey, and his successors,
Defendants.

STIPULATION OF FACTS
The parties to the instant action, by and through their counsel of record, hereby stipulate that the following facts are true and correct for the purpose of the court's consideration of the plaintiff's Motion for Partial Summary Judgement:
1. All parties are properly before the Court.
2. All parties have been correctly designated.
3. Venue of this Court is properly invoked.
4. Defendant State of New Jersey, Division of Elections, is located within the Department of Law and Public Safety as of May 29, 1998, pursuant to the 1998 Executive Reorganization plan-No. 4. Defendant Peter Verniero, as Attorney General of New Jersey, is the department head of the Department of Law and Public Safety.
5. A "political party" is defined as a party which has polled at least ten percent of the total votes cast in the state in an election held for all of the members of the General Assembly. N.J.S.A. § 19:1-1.
6. The Democratic and Republican Parties are the only "political parties" that have met the current statutory definition since its enactment in 1920.
7. The Democratic and Republican Parties are the only "political parties" currently recognized in New Jersey since the November 3, 1998 General Election.

*1054 APPENDIX-Continued
8. New Jersey voters may formally register with the appropriate county commissioner of registration as a "Democrat," "Republican" or "Independent." An independent voter is formally disaffiliated from a political party. These three designations are on the voter registration records. A voter may also be "unaffiliated" or "open." There is no such "unaffiliation" designation marked on a voter's registration records.
9. One way a voter may declare his/her political party affiliation is by signing and filing a "Political Party Affiliation Declaration Form" (hereinafter "party declaration forms"). N.J.S.A. § 19:23-45; N.J.A.C. 15:10-2.1(a)(2).
10. The Department of Law & Public Safety, through the Division of Elections, provides party declaration forms to the municipalities and counties and a voter may sign and file such form with his/her county commissioner of registration or municipal clerk. N.J.S.A. 19:23-45; N.J.A.C. § 15:10-2.6(a).
11. A voter may only formally declare political party affiliation with the Democratic or Republican parties. A voter may formally disaffiliate only as an "Independent."
12. A second means by which a voter may declare "political party" affiliation is as follows: a voter who is newly registered or who has not previously voted in a primary election may also declare his/her political party affiliation with either the Democratic or Republican political parties by voting in the party's primary election. N.J.S.A. § 19:23-45; N.J.A.C. § 15:10-2.1(a)(1). Thereafter, the voter' s voter registration records are notated accordingly.
13. A voter who has declared affiliation with a political party by either of the two above statutory means is thereafter considered to be a member of that party.
APPENDIX-Continued
N.J.S.A. 19:23-45; N.J.A.C. § 15:10-2.2(c). Such voter, however, can relinquish such membership by filing a political party declaration form to become either a member of the opposite "political party" or to become an "Independent."
14. Plaintiffs George Guzdek and John Paff and other New Jersey voters may not declare party affiliation with an alternative and/or unrecognized political group.
15. In all 21 New Jersey counties, voter registration information is maintained on computers which can produce lists of registered voters indicating political party affiliation or an "independent" status.
16. Pursuant to N.J.S.A. 19:31-18.1, each county clerk in the State is to provide to the respective chairs of the two political party county committees, five copies of the list of voters of each election district in the county. The county clerk shall, upon the request of the chair of either of the two political party state committees, provide a copy of the lists of voters of each election district in the county.
17. Voter registration lists are available to any voter for a nominal charge. N.J.S.A. § 19:31-18.1.
18. Plaintiffs Reform Party, Libertarian Party, and members of CAPP are not able to identify the members of their respective parties from the countygenerated voter registration lists.
19. Plaintiff Council of Alternative Political Parties ("CAPP") is an unincorporated association which represents four alternative political parties in New Jersey. The membership of CAPP consists of the Green Party of New Jersey, the Natural Law Party, the Libertarian Party and the U.S. Taxpayers Party of New Jersey.
20. Plaintiff Reform Party is incorporated as two distinct organizations. The Reform Party, a New Jersey Non-Profit Corporation ("Reform Party Corporation") *1055 APPENDIX-Continued
has licensed the use of its name to its membership affiliate, the Third Party Membership organization, which has come to be known as the Reform Party of New Jersey ("Reform Party").
21. Both the Reform Party Corporation and Reform Party are organized for political purposes under Title 15A of the New Jersey Nonprofit Corporation Law.
22. Plaintiff George Guzdek is a member of the Reform Party.
23. The National Reform Party, of which the Reform Party of New Jersey is a local affiliate, had its roots in the presidential election of 1992, at which time Ross Perot received 15.6%; of the popular vote in New Jersey.
24. The candidacy of Ross Perot in the 1992 presidential election led to the creation of The United We Stand movement, which became the National Reform Party in 1996.
25. Ross Perot was nominated for President by the National Reform Party in 1996 and, along with his running mate Pat Choate, received 8.52% of the popular vote in New Jersey. In 1998, the Reform Party had one congressional candidate in New Jersey.
26. Plaintiff New Jersey Libertarian Party ("Libertarian Party") has its roots in the national Libertarian Party, which was founded in 1972. The New Jersey affiliate of the national Libertarian Party was founded in 1973.
27. The Libertarian Party is not organized for political purposes under Title 15A of the New Jersey Nonprofit Corporation Law.
28. Plaintiff John Paff is a member of the Libertarian Party.
29. The Libertarian Party has run a candidate in every presidential election since 1972. Inthe 1996-election, the Libertarian Party candidate, Harry Browne, received 14,763 votes in New Jersey.
30. In the 1997 election for Governor of New Jersey, Murray Sabrin, the Libertarian Party candidate, received 114,172 or 4.7%. of the statewide vote. In the 1998 elections, the Libertarian Party ran nine congressional candidates [and a number of local candidates in New Jersey.]
31. The Green Party of New Jersey ("Green Party") is affiliated with both the Green Party USA and the Association of State Green Parties, the two national Green party organizations.
32. The Green Party has not incorporated the name "Green Party." A separate and distinct group has incorporated the name "Green Party of New Jersey."
33. The Green Party ran Ralph Nader as its candidate in the 1996 presidential election, and he received 32,465 votes or 1.06% of the statewide vote.
34. In 1997, Madelyn Hoffman ran for Governor of the State of New Jersey as the Green Party candidate and received 10,703 votes. In 1998, the Green Party ran three congressional candidates in New Jersey.
35. The U.S. Taxpayers Party of New Jersey is affiliated with the national U.S. Taxpayers Party.
36. The U.S. Taxpayers Party is not incorporated in New Jersey.
37. The U.S.-Taxpayers Party ran Howard Phillips as its candidate for president in the 1992 and 1996 presidential elections,and he received 2,670 and 3,440 votes statewide, respectively.
38. The U.S. Taxpayers Party ran congressional candidates in two districts in New Jersey in the 1998 election.
39. The Natural Law Party of New Jersey is affiliated with the national Natural *1056 APPENDIX-Continued
Law Party but is not incorporated in New Jersey.
40. The Natural Law Party ran John Hagelin as its candidate in the 1992 and 1996 presidential elections, and he received 1,353 (.04% of the vote total) and 3,887 votes (.13% of the cote total) statewide, respectively.
APPENDIX-Continued
41. In 1997, the Natural Law Party ran Lincoln Norton as its candidate for Governor and he received 2,540 votes (.11% of the vote total). In 1998 the Natural Law Party ran four congressional candidates in the general election in New Jersey.
42. Exhibit "A" attached hereto sets forth the vote totals and percentages of additional elections in which plaintiffs' ran candidates.
*1057
EXHIBIT A
Vote Totals and percentages for Plaintiff "Alternative" Political Groups
 for Various Elections
A) PRESIDENTIAL ELECTIONS
 1996-president-3,075,806 total votes
 Reform party vote totals-262,134
 8.5%
 Green party vote totals-32,465
 1.06%
 Libertarian party vote totals-14,763
 .51%
 Natural Law party vote totals-3887
 .13%
 US Taxpayers party vote totals-3440
 .11%
 1992 - President -3,343,594 total votes
 Libertarian Vote totals-6822
 .20%
 Natural Law Party vote totals-1353
 .04%
 US Taxpayer Party vote totals-2670
 .08%
 1988 - President -3,095,544 total votes
 Libertarian vote totals-8421
 .3%
 1984 -President-3,217,862 total votes
 Libertarian vote totals-6416
 .2%
*1058
 APPENDIX-Continued
 1980 - president -2,975,684 total votes
 Libertarian total votes-20,652
 .69%
 1976 - president-3,014,472 total votes
 Libertarian total votes-9449
 .3%
 1972 - president-2.997,229 total votes
 No plaintiff "alternative" policital group candidate
 B) UNITED STATES SENATOR ELECTIONS
 1996 - U.S. Senate-2,884,144 total votes
 No plaintiff "altemative" political group candidate
 1994 - U.S. Senate-2,054,887 total votes
 Libertarian vote totals-14,042
 .7%
 1990 - U.S. Senate-1,938,454 total votes
 Libertarian vote totals-13,988
 .72%
 1988 - U.S. Senate-2,991,643 total votes
 Libertarian vote totals-12,354
 .4%
 1984 - U.S. Senate-3,096,456 total votes
 Libertarian vote totals-7135
 .2%
 1982 - U.S. Senate-2,193.945 total votes
*1059
 APPENDIX-Continued
 Libertarians total votes-9934
 .5%
 1978 - U.S. Senate-1,957,515 total votes
 Libertarian vote totals-3809
 .2%
 1976 - U.S. Senate-2,771.990 total votes
 Libertarian vote totals-19,907
 .7%
C) GUBERNATORIAL ELECTIONS
 1997 Gubernatorial Election-2,418,344 total votes
 Green party vote totals-10,703
 .44%
 Libertarian (Murray Sabrin) vote totals-114,172
 4.7%
 Natural Law Party vote totals-2540
 .11%
 1993 - Governor-2,505,964 total votes
 No plaintiff "alternative" political group candidate
 1989 - Govemor-2,253,764 total votes
 Libertarian vote totals-11,878
 .53%
 1985 - Governor-1,972,624 total votes
 Libertarian vote totals-4710
 .24%
 1981 - Governor-2,317.239 total votes
 Libertarian vote totals-2377
*1060
 APPENDIX-Continued
 .10%
 1977 - Governor-2,126,264 total votes
 Libertarian vote totals-5674
 .3%
 1973 -Governor-2,126,264 total votes
 Libertarian vote totals-3071
 .14%
 D) GENERAL ASSEMBLY ELECTIONS
 1997 - Total Votes-4,283,084
 Reform Party vote totals-1780
 .04%
 Libertarian vote totals-9403
 .22%
 Natural Law Party total votes-1250
 .03%
 1995 - Total Votes-2,747,792
 Natural Law Party vote totals-3729
 .14%
 U.S. Taxpayers Party vote totals-3349
 .12%
 Libertarian vote totals-2951
 .11%
 1993 - Total Votes-4,304,471
 Libertarian vote totals-2252
 .05%
 1991 - Total Votes-3,451,375
*1061
 APPENDIX-Continued
 Liberarian vote totals-2367
 .07%
 1989 - Total Votes-4,151,828
 Libertarian vote totals-345
 .01%
 1987 - Total Votes-3,159,470
 Libertarian vote totals-538
 .02%
 1985 - Total Votes-3,543,671
 Libertarian vote totals-893
 .03%
 1983 - Total Votes-3,219,871
 Libertarian vote totals-1442
 .04%
 1981 - Total Votes-4,194,279
 Libertarian vote total-452
 .01%
 1979 - Total Votes-3,134,522
 Libertarian vote total-4871
 .16%
 1977 - Total Votes-3,863,842
 Libertarian vote totals-6873
 .18%
 1975 - Total Votes-3,659,057
*1062
 APPENDIX-Continued
 Libertarian vote totals-4540
 .12%
 1973 - Total Votes-3,930,579
 No plaintiff "alternative" political group candidate
 1971 - Total Votes-4,305,978
 No plaintiff "alternative" political group candidate
JOHN J. FARMER, JR. 25 Market Street Attorney General of New Jersey P.O. Box 112 Attorney for State Defendants Trenton, New Jersey 08625 Richard J. Hughes Justice Complex By: Donna Kelly
*1063
APPENDIX-Continued
Senior Deputy Attorney General
(609) 292-8572
SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION - MERCER
COUNTY
DOCKET NO. MER-C-000006-99
Civil Action
COUNCIL OF ALTERNATIVE
POLITICAL PARTIES ("CAPP"),
REFORM PARTY OF NEW JERSEY
INC.,NEW JERSEY LIBERTARIAN
PARTY INC., GEORGE GUZOEK,
AND JOHN PAFF,
Plaintiff(s),
v.
STATE OF NEW JERSEY, DIVISION
OF ELECTIONS and JOHN J.
FARMER, JR., in his capacity
as Attorney General of
New Jersey, and his successor,
Defendant(s).
ADDITIONAL STIPULATION
OF FACTS
The parties to the instant action by and
through their
Counsel of record, hereby stipulate that
the following facts are true and correct for
the purpose of the court's consideration of
the plaintiffs, Motion for Partial Summary
Judgment and the defendant State's
Cross-Motion for Partial Summary Judgment:
1. Currently, all the offices of the
State's 21 county commissioners of registration
have computerized voter registration
systems, which provide for four categories
of political party affiliation and/or
non-affiliation: Democrat, Republican, Independent
and Unaffiliated.
2. The ability of a county commissioner
of registration to electronically increase
APPENDIX-Continued
the number of political party designations
varies throughout the State as follows:
a. The following counties currently
have unlimited capability to increase political
party designations, with no appreciable
cost:
Burlington Hunterdon
Morris Union
b. The following counties currently
have the capability to have up to 30
political parties on their computer system,
with no appreciable cost:
Atlantic Camden
Cumberland Essex
Gloucester Mercer
Salem Middlesex
Sussex
C. The following county currently has
the capability to have up to twenty (20)
political party designations, with no appreciable
cost:
Warren
d. The following county currently has
the capability to have nine (9) political
party designations:
Monmouth
Any designation-beyond nine (9)
would require a reprogramming of the
registration system at an estimated
cost of $50,000. This reprogramming
would be done by the County MIS
office.
e. The following county currently has
the capability to have eight (8) political
party designations:
Cape May
Any designation beyond eight (8)
would require a reprogramming of the
registration system at an estimated
cost of between $5,000-$8,000. This
reprogramming would be done by the
County MIS office.
f. The following counties currently have
the capability for four political party
designations:
Bergen -
*1064
APPENDI-Continued
It is estimated that it would cost
approximately $6,000 to reprogram
the voter registration systems to
increase political party designations.
This reprogramming would be done
by a contracted vendor.
Hudson -
It is estimated that it would cost
approximately $6,000 to reprogram
the voter registration systems to
increase political party designations.
This reprogramming would be done
by a contracted vendor.
Ocean -
It is estimated that it would cost
approximately. $7,000 to modify the
computer system to increase political
party designations. This reprogramming
would be done by the
County MIS office.
Passaic -
It is estimated that it would cost
approximately $8,000 to modify the
computer system to increase political
party designations. This reprogramming
would be done by a contracted
vendor.
Somerset -
It is estimated that it would cost
approximately $6,300 to modify the
computer system to increase political
party designations. This reprogramming
would be done by the
County MIS office, which has a debit/credit
arrangement with the
Board of Elections.
3. The political party affiliation declaration
card which is currently used reads
as follows, in pertinent part:
Political Party Affiliation Declaration Form I, being a
registered voter at the address listed below, do hereby
declare that I desire to vote in primary election of
the __________________ Political Party.
(Name of Party)
4. If the Court were to order the State
to accept political declaration cards from
members of the five named plaintiff political
groups the above language would need
to be changed. In other words the
phrase "I desire to vote in the primary
election" would need to be deleted because
none of the five political groups, the Green
Party, Libertarian Party, U.S. Taxpayers
Party, Natural Law Party and Reform
Party have primary elections.
5. The Division of Elections, Department
of Law and Public Safety, prints
declaration cards and offers them for county use.
In 1999 the Division replenished
the current cards at a cost of $2,225.60. If
the Division needed to revise the language
of the card and print same, it is estimated
that it would cost approximately $3,000 for
300,000 cards.
6. Any revised card would be offered to
all the counties, free of charge. Morris
and Union Counties print their own cards.
It is estimated that it could cost Union
County $160 to print 10,000 new cards, for
Morris County it is estimated that it could
cost $175 to print 10,000 cards.
*1065 
NOTES
[1] These appeals calendared back-to-back are consolidated on the court's motion for purposes of opinion only.
[2] The RSC argues that partial summary judgment on the party affiliation declaration issue was premature. We disagree. As more fully explained in the course of this opinion, the party affiliation declaration issue addressed by Judge Parrillo is a separate issue from the other issues raised by plaintiffs. The issue implicates different interests and requires application of different principles. Contrary to the RSC argument, resolution of this issue does not presage the outcome of the other issues raised in plaintiffs' complaints.
[3] One commentator has observed that Anderson marked a striking departure from the Court's earlier approach. Richard P. Roberts, Note, Ballot Access for Third Party and Independent Candidates After Anderson v. Celebrezze, 3 J.L. & Pol. 127, 132-34 (1986). Another commentator notes that the new test articulated by the Court in Anderson and clarified by Burdick by requiring a showing that the law "severely burdened" a party's interest seemed to strengthen the hand of the state in regulation of minor political parties. Benjamin D. Black, Note, Developments in the State Regulation of Major and Minor Political Parties, 82 Cornell L.Rev. 109, 127 (1996).
[4] In any county where the voter registration lists are recorded on magnetic tape or electronic data processing cards, the tape or cards shall be made available for a uniform charge not to exceed $375. N.J.S.A. 19:31-18.1b.