GREEN PARTY OF NEW YORK STATE, Mark Dunlea, Rachel Treichler, James Lane, Shannon M. Houlihan, John N. Warren, and Lisa Chacón, Plaintiffs,

v.

NEW YORK STATE BOARD OF ELECTIONS; Carol Berman, Neil W. Kelleher, Helena Moses Donohue, and Evelyn J. Aquila, in their official capacities as Commissioners of the New York State Board of Elections; New York City Board of Elections; Nancy Mottola Schacher, Weyman A. Carey, Michael J. Cilmi, Mark B. Herman, Nero Graham, Jr., Vincent J. Velella, Douglas A. Kellner, Frederic M. Umane, Terrence C. O'Connor, and Stephen H. Weiner, in their official capacities as Commissioners of the New York City Board of Elections, and as representatives of all commissioners of county boards of elections in New York State, Defendants.

No. 02–CV–6465(JG).

United States District Court, E.D. New York.

May 30, 2003.

Jeremy Creelan, Brennan Center for Justice, New York City, for Plaintiffs.

Todd D. Valentine, Peter Kosinski, New York State Board of Elections, Albany, NY, for Defendants.

### MEMORANDUM AND ORDER INCLUDING PRELIMINARY INJUNCTION

GLEESON, District Judge.

The plaintiffs in this case are the Green Party of New York State (the "Green Par-

ty") and several of its current and prospective members. They claim that certain aspects of New York's voter enrollment scheme infringe on the First Amendment rights of minor political parties and their voters and unreasonably discriminate against them in violation of the Equal Protection Clause. Specifically, because the Green Party candidate in the 2002 gubernatorial election received fewer than 50,-000 votes, New York law requires that (1) voters can no longer enroll in the Green Party, and (2) past enrollments of Green Party members must be erased from the voter enrollment lists in the computerized databases maintained and published by local boards of elections.

I find that these challenged provisions of New York's voter enrollment scheme place a severe burden on the First and Fourteenth Amendment rights of minor parties and their voters. I further find that the defendants have not offered a compelling or narrowly tailored justification in defense of the provisions. I therefore grant a preliminary injunction that will allow New York voters to continue to enroll in the Green Party and the Green Party and its members to continue to use the enrollment lists to support their political activities.

### FACTS

#### A. *New York's Voter Enrollment Scheme*

Under New York law, a political organization that runs candidates for political office is either a "party" or an "independent body." A "party" is "any political organization which at the last preceding election for governor polled at least 50,000 votes for its candidate for governor." N.Y. Elec. Law § 1–104(3). An "independent body" is any political organization that participates in the election and campaign

process but whose candidate received fewer than 50,000 votes in the last governor's race. *Id.* at § 1–104(12). Thus, there are political organizations that are commonly and correctly referred to as political parties that are not "parties" within the meaning of New York law. To avoid confusion, I will use the upper-case term "Party" to refer to political organizations that meet the above-quoted definition of "party" in § 1–104(3).

There are various consequences that flow from being a Party, as opposed to an independent body, under New York law. Chief among them is that only a Party has the right to automatically place a candidate on the ballot for a statewide election and the ability to choose that candidate in a closed primary election. *See* N.Y. Elec. Law §§ 6–104(2) and 1–104(9); Dunlea Decl. at ¶ 12. In a closed primary, only those voters who have formally enrolled as members of a Party are allowed to vote in its primary. As a result, before a Party can conduct such a primary, two things must happen. First, voters must be able to officially notify the state and the Party that they are Party members. Second, the local boards of elections [1] who conduct the primary, and the Party itself, must be able to identify whether a voter is actually a Party member and therefore eligible to vote in the primary. New York has therefore established a voter enrollment scheme that allows voters to enroll in Parties and facilitates the publication of the Party-enrollment information of voters who do.

To register to vote in New York, a person must fill out a voter registration form. *See* Pls.' Ex. K; N.Y. Elec. Law § 5–210. A copy of the current voter registration form appears as Appendix A to this opinion. It asks for information about the voter, including name, sex, address, telephone number, and date of birth. Because a registering voter may, under N.Y. Elec. Law § 5–300, mark his or her Party enrollment "within the circle or box underneath or next to" the Party of choice, the registration form includes a section—Box 10—that allows the voter to enroll as a member of a Party. Labeled **"Choose a Party,"** that section has a box for each political party that qualifies as a Party, plus an extra box for voters who do not wish to enroll in a Party. *See* Appendix A (emphasis in original). The following note appears next to the Party enrollment boxes: *"Please note:* In order to vote in a **primary election,** you must be enrolled in a[P]arty." *Id.* (emphasis in original). There is no box labeled "other," or a blank line, or any other mechanism for the voter to enroll in, or express an affiliation with, political parties that are not Parties under New York law.

New York law requires the local boards of elections who process these voter registration forms to maintain and make available to the public "registration lists"—lists of all registered voters for each election district over which the boards have jurisdiction. *See* N.Y. Elec. Law §§ 5–602, 5–604. The information on the registration lists must include the voter's name and residence address. The local boards also must publish "enrollment lists." N.Y. Elec. Law § 5–604. The enrollment lists must include, in addition to the information on the registration lists, the Party enrollment of each voter. *Id.* In fact, they generally include more information as well, such as the voting history of each voter. The local boards and the Parties use these lists, which are maintained in computer databases and published regularly by the

---

1. I use the term "local boards of elections" to refer to the boards that constitute "boards of elections" under N.Y. Elec. Law § 1–104(26), that is, the boards of elections of the counties in New York State and the New York City Board of Elections. I use the term "State Board" to refer to the New York State Board of Elections.

boards, to conduct the closed primaries. As set forth more fully below, the Parties also use them for many other purposes.

Since a voter can enroll only in a Party and the local boards are required to maintain enrollment information only to the extent that voters are enrolled in a Party, the registered voter lists do not indicate voters' affiliations with other political parties. Furthermore, New York law requires that if a Party fails to receive the requisite 50,000 votes in the most recent gubernatorial election, it not only reverts to being an "independent body," but the local boards must also erase the enrollment information they gathered when the party was a Party. Specifically, New York law requires that the voters who previously enrolled as Party members be deemed to have expressed no Party affiliation at all. *See* N.Y. Elec. Law § 5–302(1).[2]

These provisions have the practical effect of providing two specific and direct benefits to Party members and the Parties themselves. First, Party members can publicly declare their political affiliation and have that declaration maintained and publicized in the enrollment lists. *See* Lane Decl. at ¶ 12; Houlihan Decl. at ¶¶ 4–5. Second, the Parties can use those lists not only to conduct closed primaries, but also to conduct the multitude of activities in which all political parties engage, such as identifying new voters, processing voter information, organizing and mobilizing Party members, raising funds from members, and ultimately influencing the political process. *See* Dunlea Decl. at ¶¶ 14–16, 23; Treichler Decl. at ¶¶ 6–22; Winger Decl. at ¶¶ 8–10. These benefits are unavailable to the political parties that constitute only "independent bodies" under New York law and to those voters who would like to affiliate with them. *Id.* at 16.

### B. *New York's Voter Enrollment Scheme Compared to Other States' Schemes*

There are 21 states that do not allow voters to enroll in political parties. *Id.* at ¶ 14. Those states have open primaries, that is, the voter need not be a member of a particular political party in order to participate in its primary elections. *Id.* Of the 29 states that allow voters to enroll as members of political parties, 26 provide a blank line on the voter registration form on which a voter can write in the name of any political party that he or she would like to be identified with. *See id.* at ¶¶ 11–13. By not having such a blank line, New York is one of only three states (Iowa and Kansas are the others) that limit the voters' enrollment choices to parties that have received a certain level of political support. *Id.* at ¶ 13. These party-enrollment practices are depicted visually in Plaintiffs' Exhibit O, which is attached hereto as Appendix B.[3]

Moreover, New York is one of only 11 states that make qualification as a recognized party contingent solely on past election results (the prior governor's race), rather than, for example, current party-

---

**2.** Section 5–302(1) reads in relevant part:

Before placing the registration poll record in the poll ledger, the board shall enter in the space provided therefor on the back of such registration poll record the name of the party designated by the voter on his application form, provided such party continues to be a party as defined in this law. *If such party ceases to be a party at any time, either before or after such enrollment is so entered, the enrollment of such voter shall be deemed to be blank and shall be entered as* *such until such voter files an application for change of enrollment pursuant to the provisions of this chapter.* (Emphasis added).

**3.** The 26 states that have blank lines on their registration forms have differing laws with regard to recording and disseminating what is written in the blanks. *See* Appendix B; Jan. 16, 2003 Tr. at 48–60. Three states create enrollment lists setting forth the party enrollments of every voter. Five states have notice

organization activities. Winger Decl. at ¶ 15. In other words, no amount of success in fielding or electing candidates in the four years between gubernatorial elections can enable a political party to become a Party in New York.

When the foregoing factors are considered together, New York is the only state in the nation that allows a voter to enroll only in an officially recognized political party *and* allows a political organization to qualify as a recognized party based only on the results of one election that occurs every four years. *See id.*; Jan. 16, 2003 Tr. at 62. As a result, if a political party in New York fails to meet the 50,000 vote threshold in a race for governor, it cannot reap the significant associational benefits of the state's voter enrollment scheme (discussed *infra*) for the next four years, even if it fields (or succeeds in electing, for that matter) candidates for statewide office during that period. And since the local boards purge the enrollment status of members as soon as the State Board certifies that Party status has been lost, the organization must start enrolling members again from scratch if it later regains Party status.

Plaintiffs contend, and I agree, that New York's voter enrollment scheme places "the most severe restriction on enrollment for parties not entitled to their own primary of any state." Jan. 16, 2003 Tr. at 61.

## C. *The Green Party*

The Green Party is a political organization in New York that is affiliated with the Green Party of the United States. It became active in state politics in the late 1980s, and officially organized as the Green Party in 1990. Dunlea Decl. at ¶ 2. It has an extensive party platform, bylaws, and formal statewide structure. *Id.* at ¶ 13 & Exs. A–B; *see also* Green Party homepage, *at* http://www.gpnys.org (last visited May 30, 2003). The Green Party ran candidates for governor in 1998 and 2002, as well as numerous other candidates for state and local offices. In the 2000 national election, the national party's candidate for president, Ralph Nader, received nearly 250,000 votes in New York. *See* N.Y. St. Bd. of Elects. President and Vice-President Elect. Returns Nov. 7, 2000 ("2000 Elect. Results"), *at* http://www.elections.state.ny.us/ elections/2000/wpres2000.pdf. In 2001, the Green Party ran more than 150 candidates for political office in New York, Dunlea Decl. at ¶ 20, and this month won the mayor's race in New Paltz. *See* Gabriel J. Wasserman, *Green Party Wins in New Paltz*, Poughkeepsie Journal, May 7, 2003, at 1B. In short, the Green Party is a significant, active, and growing political organization in New York.

The Green Party won official recognition as a Party under New York law in 1998, when its candidate for governor, Al Lewis—who played "Grandpa" in the hit television series "The Munsters" many years ago—received 52,533 votes. *See* N.Y. St. Bd. of Elects. Governor Elect. Returns Nov. 3, 1998 ("1998 Elect. Results"), *at* http://www. elections.state.ny.us/elections/1998/GOVWEB.pdf. In that election, twelve political organizations ran candidates for governor. Eight of them (the Conservative, Democratic, Green, Independence, Liberal, Republican, Right to Life, and Working Family Parties) received more than 50,000 votes for their candi-

requirements, *i.e.*, they record all enrollment information for parties that notify the state that they would like a tally of their enrollees. Eighteen states record enrollment information only of parties that meet a substantive support threshold, which in 16 of those states is a lesser showing than is needed to hold a primary, and which in 5 of them includes formerly qualified parties. *Id.* at 58, 60.

dates. *Id.* They each therefore qualified (or maintained their existing qualification) as a Party under New York law. Accordingly, they each received the benefit—at least until the 2002 election—of being listed as an option for voter enrollment on New York's voter registration form and of having information about their registered voters maintained and publicly disseminated in the enrollment lists by the local boards of elections.

After the November 1998 election, New York voters became able for the first time to register as members of the Green Party, and they did so in large numbers. The following chart shows the growth in the number of voters who enrolled in the Green Party.

| DATE | | ENROLLED VOTERS |
|---|---|---|
| April | 1999 | 121[4] |
| November | 1999 | 1,492 |
| March | 2000 | 3,611 |
| November | 2000 | 12,121 |
| April | 2001 | 17,992 |
| November | 2001 | 21,526 |
| April | 2002 | 25,492 |
| November | 2002 | 29,528 |

Pls.' Ex. D1.

Despite these gains, the Green Party's candidate for governor in New York's 2002 gubernatorial election, Stanley Aronowitz, received only 41,797 votes, more than 8,000 votes shy of the 50,000 vote threshold needed to maintain Party status. *See* N.Y. St. Bd. of Elects. Governor Elect. Returns Nov. 5, 2002 ("2002 Elect. Results"), *at* http://www.elec tions.state. ny.us/elections/2002/general/2002_gov.pdf.[5] By operation of N.Y. Elec. Law § 5–302(1), once those election results were formally certified, the State Board was required to take steps to remove the Green Party's name from New York's voter registration form, as New York law allows only Party enrollment, *see* N.Y. Elec. Law § 5–300, and the local boards of elections were required to (1) cease permitting voters to enroll as members of the Green Party, *see id.*, and (2) expunge from their registered voter lists the party-enrollment information of those voters who had previously registered as Green Party members. *See* N.Y. Elec. Law § 5–302(1). This would have had the twin effect of prohibiting voters from enrolling as members of the Green Party and cutting off the Green Party from current information about voters who had enrolled as members in the past.

### D. The Green Party's Use of Voter Enrollment Information

During the four-year period it was a Party, the Green Party made significant

---

4. The small number of registrations in the year following the 1998 election is likely attributable to New York's limitation on the ability of a voter enrolled in one Party to switch and enroll in another Party. When that occurs, the switch does not take effect until after the next general election. Jan. 16, 2003 Tr. at 15. Thus, the 121 enrollments as of April 1999 were all newly registered voters. *Id.*

5. The Green Party was not the only political party to lose its official Party status by failing to reach the 50,000 vote threshold in the 2002 governor's race. A total of ten parties placed candidates on the statewide ballot. *See* 2002 Elect. Results. These ten parties, in descending order based on the total number of votes their candidate received, were the Republican, Democratic, Independence, Conservative, Working Families, Right to Life, Green, Marijuana Reform, Liberal, and Libertarian Parties. *See id.* Of the eight that had qualified as Parties based on the 1998 gubernatorial election, three—the Green, Liberal, and Right to Life Parties—failed to maintain their status by reaching the 50,000 vote threshold. *See id.* The Liberal Party has reportedly disbanded, at least in part due to its loss of Party status. *See* Sara Kugler, *State Liberal Party Bows Out: Loss of Automatic Ballot Line Prompts End to its New York Operations*, Times Union, Feb. 25, 2003, at A1. Only the Green Party is a party in this lawsuit.

use of the enrollment lists. It began by obtaining the lists from the various local boards of elections. *See* Jan. 16, 2003 Tr. at 8. Although there are some differences from board to board, Plaintiffs' Exhibit C, the list for Albany County, is typical. It sets forth the Green Party members' names, addresses, dates of birth, and telephone numbers (where available).[6] The Green Party used this information to: (1) identify supporters in specific communities across the state; (2) send mailings to its members to invite them to Green Party meetings; (3) inform them about the issues the party was working on and the candidates it supports; (4) recruit petitioners for party candidates; (5) conduct get-out-the-vote efforts; and (6) raise money. *See, e.g.,* Dunlea Decl. at ¶ 15; Jan. 16, 2003 Tr. at 10–13. Because young voters comprise approximately one-third of its membership, the Green Party took steps to appeal directly to that age group. *Id.* at 10. Accordingly, in the 2002 election, one of several statewide mailings was sent to enrolled voters under 25 years of age. *Id.* A different type of mailing, for fundraising purposes, was sent to enrolled voters over 25 years of age. *Id.*

The enrollment lists also set forth the congressional district and state senate and assembly districts in which the voters reside, information that the Green Party used to target invitations to particular events. *Id.* Moreover, the form's voter

history information was useful in fundraising, as the "prime voters"—those who vote in every election—are more likely to contribute financially. *Id.* at 11.

## E. *The Present Litigation*

On December 10, 2002, three days before the 2002 election results were to be formally certified by the State Board, the Green Party and several of its current and prospective members filed the complaint in this case against the State Board, the New York City Board of Elections, and the commissioners of each.[7] On the same day, they sought a temporary restraining order and a preliminary injunction that would: (1) prohibit the defendants from taking any steps that would prevent voters from enrolling in any political party that had previously gained recognition as a Party; and (2) require that the voters' enrollment status continue to be included in the enrollment lists, even if they had enrolled in political parties, like the Green Party, that were about to lose their Party status.

### 1. *The Hearing on the T.R.O. Application*

At a hearing on December 12, 2002, the plaintiffs contended that allowing the defendants to halt voter enrollment in the Green Party and to discard the previously gathered information about enrollment in the party would prevent voters from ex-

---

6. Where the phone numbers are not included on the form, the Green Party uses the other information on the list—principally the address—to obtain the numbers from other sources. Jan. 16, 2003 Tr. at 12.

7. The New York City Board of Elections does not oppose the plaintiffs' claims, *see* Dec. 12, 2002 Tr. at 25, and did not participate in the hearing in January 2003 on the plaintiffs' application for a preliminary injunction. To the extent that the State Board has argued that the Green Party's complaint is fatally flawed for failing to name as defendants all

the local boards of elections and their commissioners, I find that the State Board has sufficient authority over the local boards' execution of New York's voter enrollment scheme by virtue of N.Y. Elec. Law §§ 3–102, 3–104 for purposes of this case and that including all the local boards, especially in light of the limited involvement of the New York City board, would have needlessly complicated these proceedings and is not required by Second Circuit precedent. *See Schulz v. Williams,* 44 F.3d 48, 61 n. 13 (2d Cir.1994).

pressing their political beliefs and associating together, in violation of the First and Fourteenth Amendments. They further contended that allowing voter enrollment only in Parties, and maintaining only Party-enrollment information in the enrollment lists, unreasonably burdened the rights of minor parties and their voters, in violation of the Equal Protection Clause of the Fourteenth Amendment.

The State Board argued that the Green Party's "associational interests are not implicated by" § 5–302(1), the provision that would require the erasure of Green Party enrollments from the local boards' enrollment lists. Dec. 12, 2002 Tr. at 18. The sole purpose of that statute, the State Board argued, "is to provide a list of people who can vote in primary elections." *Id.* at 21. The State Board conceded that, whatever the intended purpose of the voter enrollment scheme, the enrollment lists published by the local boards of elections are in fact *used* by political parties for associational purposes, including get-out-the-vote efforts and disseminating information about party positions. *Id.* at 21–22. It further conceded that the current legislative scheme, if implemented, will harm the associational interests of the Green Party by depriving it of lists of voters who have enrolled in the party in the past or would choose to do so, if permitted, in the future. However, that harm, the State Board argued, is suffered by *all* political organizations that fail to reach (or maintain) Party status. *Id.* at 22.

Asked to identify the State's interest in maintaining the current scheme, the State Board essentially identified two interests. First, it argued that allowing persons to enroll as Green Party members when it is no longer a Party would be unfair to people who choose to enroll in the Green Party. If those voters are permitted to enroll in the Green Party, they may erroneously believe that they will be able to vote—or perhaps even be a candidate—in a primary election, which of course can only be conducted by a Party. *Id.* at 20–21. Second, the State Board argued that the remaining *Parties* in New York would be prejudiced if the Green Party members continued to be listed as Green Party members because those Parties "will now be prohibited from trying to encourage the now non-enrolled voters from joining their cause." *Id.* at 23.

I granted the plaintiffs' application for a temporary restraining order. Following the inquiry prescribed by *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), and *Schulz,* 44 F.3d at 56–60, I found that the plaintiffs had alleged severe violations of their First and Fourteenth Amendment rights and that the State's asserted justifications for the challenged provisions of New York law were neither compelling nor reasonable. Given that the harm to the Green Party was set to take effect on December 13, 2002, I granted the temporary restraining order and, at the request of the defendants, scheduled a hearing on the motion for a preliminary injunction for January 16, 2003.

The restraining order directed the State Board: (1) not to implement or enforce N.Y. Elec. Law § 5–302(1); (2) to continue to allow voters to enroll in any political organization that had qualified as a Party as a result of the 1998 gubernatorial election; (3) to continue to record and maintain all information regarding the enrollment status of any voters who had enrolled in Parties that had lost their party status as a result of the 2002 election; and (4) to serve a copy of the restraining order on the local boards of elections and to ensure compliance by them with the order.

*Green Party v. State Board,* No. 02–6465 (E.D.N.Y. Dec. 12, 2002).[8]

### 2. The Preliminary Injunction Hearing

■ At the January 16, 2003 hearing on the plaintiffs' motion for a preliminary injunction, Mark Dunlea and Richard Winger testified on behalf of the Green Party and the other plaintiffs. Dunlea, the current chairperson of the Green Party, testified regarding the political activities of the Green Party and the severity of the impact of the challenged provisions of New York's voter enrollment scheme on the Green Party's continued organizational efforts. Winger, the editor of the *Ballot Access News,* a monthly newsletter that focuses on legal and political developments related to minor political parties, testified as an expert regarding voter enrollment schemes in the United States and the particular burdens that New York's voter enrollment scheme imposes on the political rights of minor parties and their members.[9] The essential facts established by their testimony, which I credit in its entirety, are set forth in the foregoing sections.

The State Board produced one witness, Carolee Sunderland, a commissioner on the Westchester County Board of Elections, who testified briefly about the nominating processes available to Parties in New York.

### DISCUSSION

### A. The Standard for a Preliminary Injunction

■ In order to win a preliminary injunction, a party must demonstrate two

8. The requirement that the State Board serve a copy of the restraining order on the local boards (which, with the exception of the New York City Board of Elections, are not defendants) was imposed with the consent of, and indeed at the invitation of, the State Board. *See* Dec. 12, 2002 Tr. at 43. I remain grateful to the State Board and its counsel for their cooperation and professionalism in that regard.

9. Plaintiffs submitted a declaration by Winger in support of their motion for a temporary restraining order. At the hearing on January 16, 2003, the State Board objected for the first time to Winger's testimony. Although I observed at the time that the objection was likely too late, I gave the State Board the opportunity to brief the issue after the hearing. *See* Jan. 16, 2003 Tr. at 76. In that memorandum, the principal attack on Winger's testimony is that he is not qualified to provide expert testimony on voter enrollment and ballot access laws in the United States and on the use of voter enrollment information by political parties. *See* State Board's Supp. Br. dated Jan. 23, 2003 ("State Board's Supp. Br.") at 2–4. The arguments include the following: "While claiming to be an expert in all fifty states, [Winger] has only testi-

fied in court or provided affidavits in court proceedings in thirty states." *Id.* at 3.

I find these and the other arguments regarding Winger's testimony unpersuasive, and the State Board's objection is overruled on the merits. Winger was fully qualified to give the challenged testimony. He is the publisher of a newsletter and author of numerous articles on minor parties and has testified as an expert in numerous courts on laws that affect these groups. *See* Winger Decl. at ¶¶ 1–4 & Ex. A. It is true, as the State Board contends, that I can take judicial notice of the states' voter registration and party enrollment schemes, *see* State Board's Supp. Br. at 4, but that does not render improper the use of a qualified expert to analyze and describe those various schemes, and to (for example) assimilate their provisions in the manner reflected in Appendix B.

In sum, I again find Winger to be a qualified expert. To the extent the factors identified by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), are applicable to Winger's expertise, they support the conclusion that his testimony has ample reliability and was properly received.

things. *Bery v. City of New York*, 97 F.3d 689, 693–94 (2d Cir.1996). First, it must show that it is likely to suffer irreparable harm without the preliminary injunction. *Id.* at 693. Second, it must show either that it is likely to win on the merits of its case or that it has at least raised "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 694 (quotations and citations omitted). If a party seeks " 'to stay government action taken in the public interest pursuant to a statutory or regulatory scheme,' " it can win a preliminary injunction only if it "meets the more rigorous likelihood-of-success standard." *Id.* (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)). I need not decide the disputed issue of whether plaintiffs are seeking to stay governmental action taken in the public interest,[10] because I conclude that they meet the more rigorous standard.

### B. *Irreparable Harm*

 The plaintiffs have satisfied the first prong of the test by alleging violations of their First and Fourteenth Amendment rights to express their political beliefs, to associate with one another as a political party, and to equal protection of the law. *See* Compl. at ¶¶ 81–83, 85–87. As the Second Circuit explained in *Bery*, "[v]iolations of First Amendment rights are commonly considered irreparable injuries for purposes of a preliminary injunction," and the very nature of the allegations is sufficient to meet the first prong of the test for a preliminary injunction. 97 F.3d at 693–94; *Beal v. Stern*, 184 F.3d 117, 123–24 (2d Cir.1999) (proceeding directly to likelihood-of-success standard where First Amendment violations alleged).

### C. *Likelihood of Success on the Merits*

Plaintiffs claim that New York's voter enrollment scheme, in particular the provisions requiring the erasure of past Green Party enrollments and precluding future enrollments in the Green Party, violates their rights under the First Amendment (which applies to New York through the Due Process Clause of the Fourteenth Amendment) to organize a political party and associate together to advance their shared political beliefs.

With regard to such First Amendment claims, the Supreme Court has explained that a court should:

> consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also much consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Because all election laws necessarily regulate First and Fourteenth Amendment rights to some degree, the "rigorousness" of a court's inquiry "depends upon the extent to which a challenged regulation burdens the First and Fourteenth Amend-

---

**10.** Although the issue is disputed, it is not briefed. Plaintiffs contend that defendants' actions "lie far outside the 'public interest,' " Plaintiffs' Mem. in Supp. of Mot. For T.R.O. and Prelim. Inj. dated Dec. 10, 2002 at 17, but their brief discusses only the likelihood-of-success standard. *Id.*

ment rights." *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. If "those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (citations and quotations omitted). If, however, the rights are subject to merely "reasonable, nondiscriminatory restrictions," then the state may justify them by showing that it has "important regulatory interests." *Id.* (citations and quotations omitted); *see also Lerman v. Bd. of Elections in the City of N.Y.,* 232 F.3d 135, 145 (2d Cir.2000). The constitutional restrictions must be considered in "the context of the state's overall scheme of election regulations," not "in isolation." *Id.*

 The plaintiffs also seek relief under the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court has explained that although "the Equal Protection Clause does not make every minor difference in the application of laws to different groups a [constitutional] violation," it does not allow for " 'invidious' distinctions," such as when state law gives "established parties a decided advantage over any new parties struggling for existence and thus place[s] substantially equal burdens on both the right to vote and the right to associate." *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). A court must therefore "examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification." *Ill. State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 183, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). If First Amendment rights "to associate as a political party" and "to express ... political preferences" "are at stake, a State must establish that its classification is necessary to serve a compelling state interest." *Id.* at 184, 99 S.Ct. 983; *see Green Party of the State of N.Y. v. Weiner,* 216 F.Supp.2d

176, 188 (S.D.N.Y.2002) (Lynch, J.) ("Plainly, state elections laws that, on their face, disproportionately burden a minority group's right to vote and corresponding associational rights are subject to strict scrutiny.") Finally, "even when pursuing a legitimate interest," the state must "adopt the least drastic means to achieve [its] ends." *Ill. State Bd. of Elections,* 440 U.S. at 185, 99 S.Ct. 983 (quotations and citations omitted); *see id.* (noting that a state's "interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation").

In some settings, it is necessary to distinguish between, on the one hand, First Amendment speech and association claims and, on the other, Equal Protection claims. But where the challenged election laws place burdens on minor political parties, these separate claims tend to coalesce. "A burden that falls unequally on new or small political parties ... impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson,* 460 U.S. at 793, 103 S.Ct. 1564; *see also Weiner,* 216 F.Supp.2d at 189 (noting that "neat distinctions" between First Amendment and Equal Protection challenges to state election laws that burden the rights of minor parties are "difficult" and perhaps "irrelevant" because "the ultimate analysis" requires the state to pass both tests). I find that in this context the balancing test is essentially the same for each claim. It weighs the severity of the burdens placed on the asserted rights by the challenged scheme, and then evaluates the interests of the state in the challenged provisions.

### 1. *The Severity of the Burdens*

 The plaintiffs claim that New York's voter enrollment scheme imposes

two separate but related burdens that constitute severe restrictions on their First and Fourteenth Amendment rights. First, they argue that, by not allowing voters to enroll in the Green Party, and by stripping the enrollment status of existing members, the scheme restricts the voters' ability to publicly express their political beliefs and to associate together in the political process. Second, they claim that the scheme severely restricts the Green Party's ability to express its political beliefs and to influence the political process because the challenged provisions, if implemented, will make it extremely difficult for the party to identify current members, recruit new ones, and reach out to all of its members—for party organizing, issue-advocacy, or fund-raising—by using the local boards' enrollment lists.

I doubt that the impingement on an individual voter's expressive interest in declaring membership in a political group on a voter registration form constitutes a severe restriction on First Amendment rights. There are numerous outlets for such expression, and the deprivation of this particular one hardly seems onerous. Indeed, as plaintiffs have demonstrated, there are currently 21 states in which all voters are precluded from expressing party affiliation at registration.

On the other hand, I have no doubt that the burdens imposed on the plaintiffs' associational rights are severe. That the enrollment lists generated by the local boards may have been intended, as the State Board argues, solely to facilitate closed primaries does not alter the fact that the Parties actually use those lists for various other purposes that lie at the heart of the political activities protected by the First Amendment. "[T]he ability to identify voters sympathetic to [a political party's] cause is significant and the lists obtained of registered and declared

[*i.e.,* enrolled] voters are a primary base for canvassing, fund-raising and other party-building activities." *Council of Alternative Political Parties v. N.J. Div. of Elections,* 344 N.J.Super. 225, 781 A.2d 1041, 1051 (App.Div.2001). That was said about the major parties' use of enrollment lists in that case, and it is equally if not more true here. The Green Party has convincingly demonstrated that the erasure of current enrollments, combined with the refusal to allow new enrollments in the Green Party at least until 2006, would render the enrollment lists useless to them as a political party. Whereas those lists would continue to be extremely beneficial to Parties, they will be no more useful to the Green Party in finding and communicating with its supporters than a telephone book.

As a result, the Green Party's ability to identify, appeal to, inform, organize, mobilize and raise money from its supporters will be severely damaged. *See Anderson,* 460 U.S. at 794, 103 S.Ct. 1564 ("By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce the diversity and competition in the marketplace of ideas.... [T]he primary values protected by the First Amendment ... are served when election campaigns are not monopolized by the existing political parties."); *Lerman,* 232 F.3d at 147–48 (noting that even if an election law "does not ban association ... altogether ... the statute need not go that far in order to substantially burden the right to political association" and that it "still can severely burden the right to engage in interactive political speech under the First Amendment" if it prevents a candidate from accessing voters or conveying a political message); *see also Atherton v. Ward,* 22 F.Supp.2d 1265, 1268 (W.D.Okla.1998) (holding that registration scheme prohibit-

ing enrollment in unrecognized political parties "places a substantial burden on the First Amendment rights of voters affiliated with the Libertarian Party"); *Council of Alternative Political Parties,* 781 A.2d at 1051 (concluding that scheme limiting enrollment choices to Republican, Democrat and Independent imposes a "considerable, albeit not severe burden" on the First Amendment rights of minor parties and their members "to express political ideas and to associate to exchange these ideas to further their political goals").

Notably, the State Board has not refuted the plaintiffs' contention that their associational rights will be severely impaired in the absence of the injunctive relief they seek. Through the filing of declarations and through the live testimony of the chairperson of the Green Party, plaintiffs have set forth the myriad ways in which the loss of enrollment lists and future voter enrollments will greatly diminish the organizing capacity and associational interests of the Green Party. The State Board has never even suggested that these effects will not occur. Indeed, with the exception of an unsuccessful effort to ridicule the Green Party for having run a former actor for governor, the cross-examination of the party chair was limited solely to the State Board's claim (addressed *infra* ) that allowing Green Party enrollment will confuse Green Party enrollees. *See* Jan. 16, 2003 Tr. at 21–32.

When viewed in the context of the plaintiffs' Equal Protection claims, these undisputed First Amendment burdens are even more severe. Through its local boards of elections, New York collects and maintains a great deal of useful information from its registered voters. It further supplies any political party that has achieved Party status not only with that information about the voters, but with a constantly updated list of the voters who wish to be affiliated with that Party. The larger, established political parties make good use of that information, *see Council of Alternative Political Parties,* 781 A.2d at 1051, as did the Green Party when it enjoyed Party status. New York may not be constitutionally required to gather and distribute such information, but when it does so, it may not provide voter enrollment information only to the large political parties, at least where the smaller parties have established a modicum of support in the electorate. *Cf. Anderson,* 460 U.S. at 793–94, 103 S.Ct. 1564 ("A burden that falls unequally on new or small political parties discriminates against those candidates and ... voters whose political preferences lie outside the existing political parties.").

The Second Circuit has already applied a heightened level of scrutiny to New York's voter enrollment scheme based on its unequal impact on the political activities of minor parties and their members. *Schulz v. Williams,* 44 F.3d 48, 59–60 (2d Cir.1994). An earlier version of N.Y. Elec. Law § 5–602 had required the local boards of elections to provide the registered voter lists to Parties free of charge and without request, but forced other organizations to request the lists and pay for the cost of copying them. *See Schulz,* 44 F.3d at 60 & n. 11. Although a three-judge district court panel struck down the statute on Equal Protection grounds, *see Socialist Workers Party v. Rockefeller,* 314 F.Supp. 984, 995–96 (S.D.N.Y.), *summarily aff'd,* 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970), the New York legislature reenacted the provision. *Schulz,* 44 F.3d at 60. The Second Circuit summarily reaffirmed the earlier panel decision and, quoting directly from it, agreed that when "the effect of [an election law] is to deny independent or minority parties an equal opportunity to win the votes of the electorate," the state must come forward with a "compelling state interest" or at least "a justifiable

purpose for granting what, in effect, is a significant subsidy only to those parties which have the least need" for it. *Id.* at 60 (internal citations and ellipsis omitted). Once the state chose to provide a benefit to "the large political parties," it could not, consistent with the Equal Protection Clause, "deny them to those parties which can least afford" to provide them on their own. *Id.*

The plaintiffs' Equal Protection claims here are at least as strong as those presented in *Schulz.* Green Party members, unlike members of Parties, will be prevented from maintaining their enrollment as Green Party members, and the Green Party and its members will be deprived of the substantial benefits that the Parties derive from the enrollment lists. *Id.* New York's voter enrollment scheme facilitates—and indeed subsidizes—significant associational activities of the major Parties, while smaller political parties are left to do the work on their own. Indeed, unlike the situation corrected by *Schulz,* where the Green Party could at least avail itself of the information at issue by reimbursing the local boards of election for the costs of reproducing the enrollment lists, the information at issue here will not be available at all. The logic of *Schulz* suggests that New York's voter enrollment scheme can only withstand constitutional challenge upon a showing of a compelling state interest.

### 2. *The State's Asserted Interests in its Voter Enrollment Scheme*

The State Board offers two interests in support of the current enrollment scheme. First, it contends that New York may "reasonably restrict access" access to the primary election process. State Board's Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. dated Jan. 3, 2003 ("State Board's Memo") at 7. The 50,000 vote requirement for access to its enrollment scheme, the State Board contends, "developed from the need to regulate the primary election process." *Id.*

The obvious defect in this purported justification is that plaintiffs do not seek access to the primary election process, and thus are not challenging the 50,000 vote threshold for maintaining Party status. The Green Party accepts its demotion from Party to independent body and does not seek to hold primary elections. Rather, plaintiffs seek only what the State Board itself describes as "the *limited relief* of requiring county boards of election throughout New York State to maintain lists of persons as still enrolled" in the Green Party. *Id.* at 10 (emphasis added). And that is indeed limited relief; as the New York City Board of Elections observed before it bowed out of the case, "converting the enrollment of the Green Party members to blank is a ministerial act by the City Board as well as every other county board." Dec. 12, 2002 Tr. at 25. Plaintiffs seek to enjoin that ministerial act.

True, plaintiffs seek an order that requires not only the preservation of past Green Party-enrollment data, but the continued *collection* of it as well, even through the Green Party is no longer a Party. And although the State Board's brief purports to address only the former issue, the only other interest it advances relates to the latter. That interest is in preventing "voter confusion," and is stated as follows:

This relief creates very troublesome outcomes for voters in New York. First, it misrepresents the status of these voters. They would not be members of an official party despite being listed on official board of elections records as members of a party. Second, and most troubling, it may mislead voters who enroll in this "party" into thinking they are joining an

official party when they are not. Official parties in New York enjoy certain privileges; for example they can organize into state and county committees under Article 2 of the Election law. Official parties can run primaries where only voters enrolled in their party are allowed to vote to choose their party's candidates. Election Law § 8–302(4). Parties enjoy certain fund-raising limits under Article 14 of the Election Law. None of these privileges extend to the Green Party following the 2002 general election. However, if people are allowed to continue enrollment in this "party" they may believe the Green Party continues to enjoy these privileges. This may cause voters who wish to vote in a primary election not to enroll in one of the five remaining parties which would disenfranchise them by not allowing them to vote in a primary election. For example, those presently enrolled in the Green Party may choose to enroll in one of the five remaining parties. Such change would take place in November of 2003 allowing them to vote in the presidential primary in March of 2004. First time registrants could immediately enroll in one of the five parties, allowing them to vote in the September, 2003 primary. Continued official representation of the existence of the Green Party, which is no longer a party, may confuse voters who would believe they could vote in the primary only to discover they cannot. This voter confusion would result from county boards of election's [sic] continued representation on official voter rolls and voter registration forms that the Green Party is still a recognized party. In fact, the Election law requires that the voter registration form state

that enrollment in a political party is required to vote in a primary election when giving registrants the opportunity to select enrollment in a party or register to vote but not enroll in a party. Election Law § 5–210(5)(f). Significantly, plaintiffs have not challenged this statute. This would remain in place, confusing voters as to the impact of their selection.

State Board's Memo at 10–11.

I note at the outset an intrinsic weakness in the State Board's argument. The prospective "confusion" it relies on is not the confusion of voters generally, but rather is limited to those who, if permitted, would enroll in the Green Party. Thus, in attempting to justify laws that will prohibit voters from enrolling in the Green Party, the State Board contends that those laws are actually good for the voters who want to enroll in the Green Party. I strongly suspect, especially given the showing by plaintiffs, *see, e.g.,* Houlihan Decl., that those voters would feel otherwise.

Second, the principal confusion the State Board fears stems entirely from New York's idiosyncratic definition of a political "party." The State Board worries that would-be Green Party enrollees will believe they are enrolling in a real, "official" political party. But in the voters' lexicon that is precisely what such enrollees would be doing. The Green Party is widely and correctly recognized as an established political party in every sense of the phrase. That it happens to be among the political parties that cannot hold a closed primary in New York does not alter that fact.[11]

Third, I see no significant reason for confusion and readily available means of

---

11. The State Board's oral argument betrayed the anomaly created by the statutory definition. Counsel's contention that "[t]hey are not a party" was followed immediately by:

"They are also the only party to bring this action. Neither the Liberal Party nor the Right to Life Party [is named as a plaintiff.]" Jan. 16, 2003 Tr. at 97.

ensuring that there will be none. The State Board relies heavily on the fact that New York's registration form says "In order to vote in a **primary election,** you must be enrolled in a party." Appendix A (emphasis in original). This would confuse Green Party enrollees, the State Board argues, "as to the impact of their selection." State Board's Memo at 11. I disagree. The quoted admonition does not guarantee those who enroll in a political party that they will be able to vote in a primary. Indeed, Parties themselves do not always conduct primaries. There is no reason why being told that Party enrollment is necessary to voting in a primary will confuse an enrollee into believing it is sufficient as well.

In any event, the registration form could easily be amended to inform the registering voter explicitly that only specified political parties may have primary elections. The State Board posits that certain voters who want to join the Green Party will want to vote in a primary even more, and will enroll in a Party instead if they know the Green Party cannot hold a primary. I am skeptical of the claim that such voters exist at all, let alone in meaningful numbers, but a simple notation on the registration form of the primary-eligible political parties would enable those voters to get their wish.

The State Board's reliance on precedent from other circuits ignores two key considerations in those decisions: (1) whether the complaining minor parties had made an independent showing (regardless of the states' thresholds for party qualification) that they enjoyed "some modicum of political organization and support" that warranted state recognition, *Baer v. Meyer,* 728 F.2d 471, 476 (10th Cir.1984) (*per curiam* ); and (2) whether the states had shown that substantial administrative or financial burdens would arise if they were required to open their voter enrollment schemes to the complaining minor parties. *See Iowa Socialist Party v. Nelson,* 909 F.2d 1175, 1180–81 (8th Cir.1990).

For instance, in *Baer,* the Tenth Circuit rejected Colorado's threshold and opened its voter enrollment scheme to the Citizens and Libertarian Parties because those parties had demonstrated a modicum of support by fielding candidates through the petition process and because the state's administrative burden was "merely nominal." 728 F.2d at 475–76. The same court upheld Oklahoma's threshold four years later when challenged by the Libertarian and Populist Parties, finding that a "substantial" administrative burden would attend any change in the state's voter enrollment scheme and the parties had not "shown the modicum of support necessary to receive recognized status." *Rainbow Coalition of Okla. v. Okla. State Election Board,* 844 F.2d 740, 747 (10th Cir.1988). Ten years later, however, a district court found that Oklahoma's administrative burden had become "insubstantial" and that the Libertarian Party had demonstrated a "significant modicum of support and organization in Oklahoma" by, among other things, placing candidates on the ballot by petition. *Atherton,* 22 F.Supp.2d at 1268. In those circumstances, Oklahoma was ordered to permit voters to enroll as members of political parties that had lost their recognized status. *Id.* at 1269; [12] *see also*

---

12. After *Atherton,* the Oklahoma legislature created a new entity, a "political organization" (defined as a political group that had qualified as a political party under state law but then failed to retain its qualified status), and it altered the state's voter registration form to allow voters to enroll in these political organizations. *See* Pls.' Ex. J–20; Okla. Stat. tit. 26 §§ 1–109(B), 4–112(A).

Similarly, the Colorado legislature responded to the Tenth Circuit's decision in *Baer* by amending its voter enrollment scheme to al-

*Iowa Socialist Party,* 909 F.2d at 1180 (upholding Iowa's enrollment threshold because, in addition to the "real" financial burden that opening voter enrollment would impose on the state, the Iowa Socialist Party was a "tiny fractional interest," having polled only "three-hundredths of one percent of the total vote cast for president in 1988"); *Council of Alternative Political Parties,* 781 A.2d at 1052–53 (opening New Jersey's voter enrollment scheme to several minor political parties because they had a "defined organization with officers, a steering committee and dues-paying members" and "procedures for nominating members as candidates for particular offices," which indicated political support, and because the state's administrative burden was "nominal").[13]

These dual considerations—the support demonstrated by the complaining party and the lack of any demonstrated administrative burden by the state—weigh heavily in favor of the plaintiffs here. The Green Party has easily demonstrated that it enjoys a "modicum of support" in New York, and the State Board does not contend otherwise. The Green Party is an established and growing political organization in New York state and national politics. It has placed candidates on the ballot in the last four statewide elections, Dunlea Decl. at ¶¶ 8–25, and it won over 40,000 votes in

the last two gubernatorial elections. 1998 Elect. Results, 2002 Elect. Results. The national party's candidate for president won over 3.5% of the votes cast in New York in 2000. 2000 Elect. Results. In 2001, the Green Party ran more than 150 candidates for political offices in New York. Dunlea Decl. at ¶ 20. Most dramatically, since qualifying as a party in 1998, almost thirty-thousand voters have made use of the state's voter enrollment scheme to enroll as Green Party members, and the party and its voters have made effective use of the enrollment lists to further their political activities. The State Board thus finds no support in cases rejecting constitutional challenges brought by political organizations found to be "tiny fractional interests." *Iowa Socialist Party,* 909 F.2d at 1180; *Rainbow Coalition,* 844 F.2d at 747.

New York would not face any meaningful administrative or financial burden if it were to open its voter enrollment scheme to the Green Party. Voter registration and voter enrollment lists are all computerized and readily accessible to election officials. The Green Party's name already appears on the voter registration form, and the state must revise the form anyway because of the 2002 election results and changes in federal election law. *See* Help

---

low voters to register as members of "political organizations," which it defined as any political group that placed a candidate on an election ballot by petition, and to maintain that information in the state's registered voter records. *See* Pls.' Ex. J–4; Colo.Rev.Stat. §§ 1–1–104(24), 1–2–218.5.

**13.** Although the relative height of the states' thresholds and the number of other parties qualified for enrollment were relevant in these cases, *see, e.g., Baer,* 728 F.2d at 472 (noting Colorado's high threshold for gaining access to its voter enrollment scheme and that only the Democratic and Republican Parties had overcome it), courts nonetheless independently evaluate the states' purported interests

in applying their thresholds to the complaining minor parties because of the nature of the constitutional burdens imposed on them and their voters. *See, e.g., id.* at 476 (finding that the minor parties were "entitled to designation on the voter registration forms because they previously managed to get candidates supporting their organization on the ballots in Colorado"); *Atherton,* 22 F.Supp.2d at 1268 (concluding that the Libertarian Party was "entitled to be heard as a party with respect to First Amendment rights and to be protected from undue restriction by the State of Oklahoma" because of its "significant modicum of support and organization").

American Vote Act of 2002, Pub.L. No. 107–252. The local boards of elections already enroll and maintain Green Party members in their voter enrollment lists, and although election officials would be forced to continue to permit enrollment in the Green Party, there is no suggestion that such an order would impose a burden or cost on the local boards.[14] Indeed, despite my express invitation, New York has not asserted any administrative or financial objections to the relief plaintiffs seek.[15] Thus, no such hardship counsels against altering New York's voter enrollment scheme in order to alleviate the burden it imposes on the constitutional rights of the Green Party and its voters.

### 3. *Resolution of the Balancing Test*

I conclude that New York's voter enrollment scheme: (1) imposes a severe burden on the plaintiffs' First Amendment rights; and (2) unreasonably discriminates against minor parties and their voters. The State Board has failed to present a compelling and narrowly tailored state interest in denying minor parties and their voters access to the state's voter enrollment scheme. The purported interest in preventing voter confusion is unpersuasive. The absence of any administrative or fi-

nancial burden if relief is granted further counsels in favor of injunctive relief. The plaintiffs have therefore easily demonstrated a likelihood of success on the merits of their case.

Finally, even if the burdens imposed by the challenged provisions of New York law were not severe, and the foregoing strict scrutiny were inapplicable, New York would still be required to justify the provisions as a "reasonable way of accomplishing" a "legitimate interest." *Burdick,* 504 U.S. at 440, 112 S.Ct. 2059; *see Schulz,* 44 F.3d at 57. The challenged provisions do not withstand even that less rigorous standard.

The avoidance of voter confusion is obviously a legitimate state interest, and New York must be free to tailor its voter enrollment procedure to further that interest. However, the precise interest here is ensuring that prospective enrollees in a political party that has established a modicum of support, but yet is not a Party, understand that they are not enrolling in a Party. Thus, the voter should know prior to enrollment that the political party does not enjoy the automatic ballot access rights that Parties enjoy, which include (but are not limited to) the right to conduct a closed primary.[16]

---

**14.** *See Baer,* 728 F.2d at 475 ("The record reflects that the burden on the Secretary of State to permit and include in the computerized record a citizen's designation of its [sic] affiliation with either of the two plaintiff parties would be merely nominal. All that is required to accomplish this objective is to inform voters that they can indicate their support for these parties on the registration form, and to include in the computer an additional letter 'C' [for Citizen's Party] and an additional letter 'L.' [for Libertarian Party]"); *Atherton,* 22 F.Supp.2d at 1268 ("[T]he burden to the State of Oklahoma in permitting members of the Libertarian Party to register their political affiliation and recording the information by computer is insubstantial. Defendants concede that computerization of Oklahoma's

voter registration records and adoption of the current application form make recordation of Libertarian designations an easy task."); *Council of Alternative Political Parties,* 781 A.2d at 1052 (concluding that the costs and administrative burden to New Jersey in changing their voter enrollment scheme were "minimal").

**15.** At the December 12, 2002 proceeding I invited evidence on whether the relief sought by plaintiffs would pose an administrative burden to the local boards of elections. *See* Dec. 12, 2002 Tr. at 31.

**16.** Parties enjoy other forms of ballot access as well, including nomination by caucus and statewide nominating convention. *See* Jan.

Prohibiting enrollment entirely, and purging the enrollment lists of existing Green Party members, is not a reasonable means of accomplishing this interest. Indeed, the purging required by § 5–302(1) does not relate to this potential confusion at all. If voters who previously enrolled as Green Party members are confused about whether they can still vote in a primary election, purging their enrollment will not set them straight. The state can simply notify such voters that they are no longer eligible to vote in a primary and alert them that if they desire to do so they must change their enrollment status.[17]

As for the future Green party enrollees, the potential for confusion can easily be eliminated on the registration form itself, as discussed above. In short, refusing to allow those voters to enroll at all, and refusing to provide the Green Party with the enrollment data that would otherwise be collected and published if it were still a Party, is not a reasonable way of accomplishing the only stated goal of the challenged provisions.

### D. The Form of Relief

#### 1. The Relief Required by the Preliminary Injunction

The December 12, 2002 temporary restraining order sought to preserve the voter enrollment status quo for the Green Party and its voters. The State Board was ordered: (1) not to implement § 5–302(1), that is, not to erase the existing enrollment data; (2) to continue to allow voters to enroll in the Green Party; and (3) to continue to enter and maintain all information regarding the enrollment status of any voters who enroll as Green Party members.[18]

For the reasons set forth above, I hereby grant a preliminary injunction to require, in essence, a continuation of the interim relief afforded the Green Party by the temporary restraining order. Specifically, the State Board is ordered to:

(a) maintain on New York's voter registration form a box that permits the voter to enroll in the Green Party (unless the State Board or the state legislature chooses to make broader changes (see infra)). That box shall be in the form appended hereto as Appendix C;

(b) direct the local boards of elections to maintain and update the enrollment information of Green Party enrollees, so that the enrollment lists reflect all past and future enrollees in the Green Party; and

(c) ensure that the foregoing directives remain in force until the results of the 2006 gubernatorial election are formally certified.

The State Board objects to this form of relief on the ground that "[t]here is nothing to show that any person who chooses

---

16, 2003 Tr. at 24–25; N.Y. Elec. Law §§ 6–104, 6–106, 6–108, 6–124. However, the present registration form focuses the prospective enrollee solely on the Parties' ability to conduct primary elections. See Appendix A.

**17.** At the December 12, 2002 hearing, counsel for the state suggested that this was already the practice. See Dec. 12, 2002 Tr. at 32–33.

**18.** The order also applied to the other two political organizations (the Liberal Party and the Right to Life Party) that had qualified as Parties in 1998 but failed to meet the 50,000

vote threshold in the 2002 gubernatorial election. As I stated at the hearing on December 12, 2002, interim relief relating to all three former Parties was likely to be far less cumbersome to the state. If relief had been granted only as to the Green Party, the State Board would have had to change the registration forms (to eliminate the Right to Life Party and the Liberal Party), and the local boards would have been required to purge the existing registration data only with respect to those two parties. See Dec. 12, 2002 Tr. at 34.

[to check the Green Party box] would in reality be a non-enrolled voter." State Board's Opp'n to Pls.' Proposed Instr. for Voter Regist. Form dated Jan. 30, 2003 ("State Board's Opp'n") at 2. But such persons would "in reality" be *enrolled* voters. Indeed, that is the central point of the injunction—New York's enrollment scheme cannot lawfully be limited solely to Parties. Green Party enrollees may no longer be enrolled in a Party, but they will be enrolled in a political party.

The State Board's contention that the box in Appendix C "would not alleviate voter confusion," *id.*, rings hollow. From the outset of this case, the State Board contended that Party status confers "certain privileges"—organizing county committees, conducting closed primaries, etc.—and that the purpose of the notice in the enrollment box on the current registration form (*see* Appendix A) is to apprise voters that they must enroll in a Party in order to enjoy those privileges. *See, e.g.,* State Board's Memo at 10–11; Jan. 16, 2003 Tr. at 99. That notice mentions only primary elections, but the State Board obviously finds it sufficient to convey to the voter all of the favorable consequences of Party status. The new enrollment box prescribed by this order conveys precisely the same notification to future enrollees. That is, Green Party enrollees will be told that they will enjoy no greater privileges in connection with nominating candidates than do voters who check the box that says: "I DO NOT WISH TO ENROLL IN A PARTY."

### 2. *Relief the State Board and State Legislature Should Consider*

The scope of the foregoing relief could hardly be narrower, particularly given the factual findings and legal conclusions set forth above. I therefore hasten to add, respectfully, that the State Board and

state legislature would be well-advised to consider broader changes to New York's enrollment scheme in order to accommodate some or all of the following considerations, and perhaps avoid unnecessary litigation.

First, whereas the temporary restraining order benefitted the Liberal Party and the Right to Life Party as well as the Green Party, the preliminary injunction entered here does not. Neither of those other parties has sought to intervene in the case. The plaintiffs explicitly seek to vindicate the interests of these and other absent political parties and their members, *see* Jan. 16, 2003 Tr. at 93, but I am disinclined to grant relief to parties that have neither requested it nor demonstrated their entitlement to it, even if it appears they might have a strong case. *See Baer*, 728 F.2d at 476 (limiting relief to minor parties before the court); *Atherton*, 22 F.Supp.2d at 1269 (affording relief to the Libertarian Party, the only plaintiff in the case); *Council of Alternative Political Parties*, 781 A.2d at 1052 (limiting relief to minor parties before the court). On the other hand, the State Board and the state legislature are not precluded by this order from continuing to include a box on the registration form for enrollment in the Liberal Party and the Right to Life Party as well, or from preserving and continuing to publish enrollment data for those parties in the enrollment lists. A visual depiction of such an enrollment box appears as Box 1 on Appendix D.

Second, assuming *arguendo* that a demonstration of a modicum of support is a necessary prerequisite to the sort of relief ordered here, the State Board may wish to consider that there are other ways, in addition to garnering 50,000 votes for a candidate for governor, to make such a demonstration. The plaintiffs seek to open New York's voter enrollment scheme not

just to themselves and the other two former-Parties, but to all voters and all political organizations that fielded candidates in the most recent statewide election. Under this proposal, an "Other" line would follow the boxes for Parties on the registration form. *See* Box 2 on Appendix D. On that line, voters would be able to express their affiliation for any other political party. The explicit identification of those parties that have demonstrated a modicum of support (like the Green Party has here) strikes me as appropriate, but I need not address at this time whether it would be required if the State Board and state legislature opt for an "Other" line on the registration form. The suggested form identifies as examples those political parties that had qualified as Parties based on the prior gubernatorial election (a more retrospective approach), but it might instead list those parties that placed candidates on the ballot in the most recent gubernatorial election (a more contemporary indication of support). As for record-keeping, local boards of elections would maintain in their enrollment lists voters who enrolled in any political organization that has demonstrated sufficient support to place a candidate on the ballot in the most recent statewide election. *See* Pls.' Proposed Instr. for Voter Regist. Form dated Jan. 23, 2003 at 3–5; Jan. 16, 2003 Tr. at 93–95.

I note in passing that the State Board's objection to an "Other" line in the voter enrollment box is not persuasive. Supported by an affidavit of a commissioner of a local board of elections, the State Board contends that voters' handwriting can be difficult to read or ambiguous if, for example, they write "Lib." instead of either Liberal or Libertarian. *See* State Board's Opp'n at 2 & Sunderland Aff. at ¶¶ 2–4. Of course that is true, but if a voter's enrollment choice is unreadable or ambiguous, it need not be recorded. That is scarcely a reason to preclude all voters

from choosing their political party of choice. And the problems of administration cannot be insurmountable, as they have not kept 26 of the 29 states that permit party enrollment from using an "Other" line on their forms.

The local board commissioner also claims that a "massive effort" would be needed "to explain to voters that they can only specify a certain group in the blank space." Sunderland Aff. at ¶ 4. No such effort would be needed, as the voters could write whatever they wanted in the space. Under this proposal, however, the local boards would be required to record in their enrollment lists only the legible enrollments in political parties that have placed a candidate on the ballot in the previous statewide election.

Finally, the State Board and state legislature may choose to consider yet another option. The enrollment form for this more expansive option would be identical to the one just suggested, *i.e.*, Box 2 in Appendix D, but the record-keeping would not be limited as described above. Rather, as is currently the procedure in three states, all enrollments would be recorded on the enrollment lists, even if the group written on the blank line has not achieved a modicum of support. *See* Jan. 16, 2003 Tr. at 53–55. While such groups' constitutional challenges may be less likely and less weighty if made, perhaps the significant advancements in technology in recent years counsel in favor of such a scheme nonetheless.

### CONCLUSION

For the foregoing reasons, the State Board is ordered to:

(a) maintain on New York's voter registration form a box that permits the voter to enroll in the Green Party (unless the State Board or the state legislature

chooses to make broader changes). That box shall be in the form appended hereto as Appendix C;

(b) direct the local boards of elections to maintain and update the enrollment information of Green Party enrollees, so that the enrollment lists reflect all past and future enrollees in the Green Party; and

(c) ensure that the foregoing directives remain in force until the results of the 2006 gubernatorial election are formally certified.

A status conference will be held on June 4, 2003 at 12:00 p.m.

So Ordered.

## APPENDIX A

# New York State Voter Registration Form

*Vote New York*

**You Can Use This Form To:**
- register to vote in New York State
- change your name and/or address, if there is a change since you last voted
- enroll in a political party or change your enrollment

**To Register You Must:**
- be a U.S. citizen
- be 18 years old by December 31 of the year in which you file this form (*note*: you must be 18 years old by the date of the general, primary or other election in which you want to vote).
- not be in jail or on parole for a felony conviction
- not claim the right to vote elsewhere

Información en español: si le interesa obtener este formulario en español, llame al 1-800-367-8683

中文資料：如果你有興趣索取本中文資料表格，請電 1 - 800 - 367-8683

**To Complete This Form:**
Fill in all the boxes that apply to you.

*Box 4:* Give your home address.

*Box 5:* Give your mailing address if it is different from your home address (post office box no., star route or rural route no., etc.)

*Box 7:* The completion of this box is optional.

*Box 9:* If you have never voted before, write "None." If you can't remember when you last voted, put a question mark (?). If you voted before under a different name, put down that name. If not, write "Same."

*Box 10:* Check one box only.

*Box 11:* This application must be signed and dated in ink.

If you will need an application for an Absentee Ballot or would like to be an Election Day Worker, please check below.

**Deadline Information:**
You can register in person at your county board of elections on any business day, except election day. If you want to vote in an election, you must mail or deliver this form to your county board of elections no later than 25 days before the election in which you want to vote. Your eligibility to vote will be based on the date you file this form, and your county board will notify you of your eligibilty.

**Need More Registration Forms?**
You can get registration forms at most state agency offices and post offices or at any county board of elections.

**Questions?**
Call your county board of elections. Find the phone number on the other side of this form. Or call 1-800-FOR-VOTE Hearing impaired people with TDD·may call 1-800-533-8683. Or visit our website - www.elections.state.ny.us

**Please print or type in blue or black ink**

MREG(4/01)

☐ Yes, I need an application for an Absentee Ballot ☐ Yes, I would like to be an Election Day Worker

**1** Are you a U.S. citizen? ☐ Yes ☐ No If you answered NO, do not complete this form.

**2** Check boxes that apply:
☐ new registration and enrollment ☐ address change
☐ party enrollment change ☐ name change

For Board Use Only

**3** Last Name | First Name | Middle Initial | Suffix

**4** Address Where You Live (do not give P.O. address) | Apt. No. | City/Town/Village | Zip Code | County

**5** Address Where You Get Your Mail (if different from above) | P.O. box, star rte., etc. | Post Office | Zip Code

**6** Date of Birth **7** **Sex** (circle) M F **8** Home Tel Number (optional)

**9** The last year you voted | Your Address was (give house number, street, and city) | In county/state | Under the name (if different from your name now)

**10** Choose a Party — Check one box only
☐ REPUBLICAN PARTY
☐ DEMOCRATIC PARTY
☐ INDEPENDENCE PARTY
☐ CONSERVATIVE PARTY
☐ LIBERAL PARTY
☐ RIGHT TO LIFE PARTY
☐ GREEN PARTY
☐ WORKING FAMILIES PARTY
☐ I DO NOT WISH TO ENROLL IN A PARTY

*Please note:* In order to vote in a primary election, you must be enrolled in a party.

**11** **AFFIDAVIT:** I swear or affirm that
- I am a citizen of the United States.
- I will have lived in the county, city, or village for at least 30 days before the election.
- This is my signature or mark on the line below.
- The above information is true. I understand that if it is not true I can be convicted and fined up to $5,000 and/or jailed for up to four years.

↓ Signature or mark ↓

X _____ Date _____

Please do not write in this space

## APPENDIX B

Party Enrollment Practices in the 50 States

# APPENDIX C

## AMENDED ENROLLMENT FORM REQUIRED BY PRELIMINARY INJUNCTION

Choose a Party – Check one box only

☐ REPUBLICAN PARTY
☐ DEMOCRATIC PARTY
☐ INDEPENDENCE PARTY
☐ CONSERVATIVE PARTY
☐ WORKING FAMILIES PARTY

*Please note:* In order to vote in a **primary election, you must be** enrolled in one of these parties.

☐ GREEN PARTY

☐ I DO NOT WISH TO ENROLL IN A PARTY

# APPENDIX D

## AMENDED ENROLLMENT FORMS NEW YORK SHOULD CONSIDER

**Box 1**

Choose a Party – Check one box only

☐ REPUBLICAN PARTY
☐ DEMOCRATIC PARTY
☐ INDEPENDENCE PARTY
☐ CONSERVATIVE PARTY
☐ WORKING FAMILIES PARTY

*Please note:* In order to vote in a **primary election, you must be** enrolled in one of these parties.

☐ RIGHT TO LIFE PARTY
☐ GREEN PARTY
☐ LIBERAL PARTY

☐ I DO NOT WISH TO ENROLL IN A PARTY

**Box 2**

Choose a Party – Check one box only

☐ REPUBLICAN PARTY
☐ DEMOCRATIC PARTY
☐ INDEPENDENCE PARTY
☐ CONSERVATIVE PARTY
☐ WORKING FAMILIES PARTY

*Please note·* In order to vote in a **primary election, you must be** enrolled in one of these parties.

☐ OTHER (write in) _____
 (Examples: Right to Life Party, Green Party, Liberal Party)

☐ I DO NOT WISH TO ENROLL IN A PARTY